[No. C010739. Third Dist. Oct. 29, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT MORALES, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II, and IV through XIV.

**COUNSEL**

Thomas Lundy, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Cynthia G. Besemer, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SCOTLAND, J.**—Late one night, defendant Robert Morales acted as a lookout while his brother, Johnny Morales, broke into a locked car which was parked in the lot of an apartment complex.[1] Confronted by a resident of the complex, defendant and Johnny fled on foot. They were pursued by several apartment residents, including Terry McFarland and John Fitzgerald. Defendant, who was armed with a knife, was cornered by McFarland, who was armed with a baseball bat. McFarland told defendant to drop the knife. Defendant refused and lunged at McFarland, stabbing him fatally. Meanwhile, Johnny struggled with Fitzgerald. Defendant aided Johnny by stabbing Fitzgerald, but Fitzgerald obtained McFarland's bat and struck Johnny and defendant. The brothers then charged Fitzgerald; Johnny held him down while defendant stabbed him two or three times.

Defendant was convicted of first degree murder of McFarland with personal use of a knife (Pen. Code, §§ 187, 189, 12022, subd. (b); further section references are to the Penal Code unless otherwise specified), attempted murder of Fitzgerald with personal use of a knife and a bat, and with the infliction of great bodily injury (§§ 187, 664, 12022, subd. (b), 12022.7), burglary of a motor vehicle (§ 459), and attempted vehicle theft (§ 664; Veh. Code, § 10851).

Noting this case was tried on the theory that the brothers broke into a locked car with the intent to steal, defendant contends there is insufficient evidence that his accomplice, Johnny, entered the vehicle with the intent to permanently deprive its owner of the car or property therein and, thus, defendant's conviction for automobile burglary (a felony) must be reversed, as must his murder conviction (which was premised on the felony-murder rule) and his attempted murder conviction (as to which the prosecution argued that defendant had no right of self-defense because his victim was lawfully apprehending a felon).

Defendant acknowledges that an intent to permanently deprive the owner of property can be inferred from the attempted taking of that property. However, he suggests this rule should not apply to automobiles because the Legislature has enacted three statutes punishing the taking or use of a vehicle without the owner's consent. Noting that "[o]ne entails intent to steal [section 487, subdivision 3 (grand theft automobile),] one entails intent to permanently or temporarily deprive the owner of title or possession [Vehicle

---

[1]Robert and Johnny Morales were codefendants at trial. For simplicity and to avoid confusion, we shall refer to Robert Morales as "defendant" and to his brother as "Johnny." Collectively, we shall sometimes refer to them as "the brothers."

Code section 10851 (unlawful driving or taking an automobile),] and one entails an intent to temporarily use [section 499b (joyriding)]," defendant argues "[t]hese statutes embody the Legislature's recognition that the mere taking of a vehicle does not demonstrate the taker's intent because an automobile—by its very nature—is the type of property which, unlike money, etc., is prone to taking for temporary as well as permanent use." It follows, defendant argues, that an intent to permanently deprive the owner of property cannot be inferred from the break-in and attempted taking of a locked automobile.

In the published portion of this opinion, we reject defendant's contention because, as we shall explain, the requisite intent for automobile burglary may be inferred from the circumstances surrounding the break-in of a locked vehicle. That the Legislature has enacted separate crimes and punishments for different types of automobile takings does not preclude the trier of fact from concluding, based on the circumstances of the break-in of a locked vehicle, that the culprit intended to permanently deprive the owner of the car or property therein. The statutes governing the taking or driving of a vehicle, or the attempt to do so, simply establish different crimes *depending on the factual determination made by the trier of fact* as to the intent of the perpetrator in attempting to take or drive a motor vehicle. Here, the circumstances surrounding the break-in (which occurred late at night and was committed by two culprits, one of whom was armed with a knife and used deadly force in an attempt to avoid being apprehended) support an inference that the brothers intended to permanently deprive the owner of property and, thus, are sufficient to support defendant's conviction for the crime of automobile burglary.

In the unpublished parts of this opinion, we reject defendant's many other claims of prejudicial error. Accordingly, we shall affirm the judgment.[2]

## FACTS

Viewed in the light most favorable to the judgment (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the evidence is as follows:

At approximately 10 p.m. on December 2, 1988, Troy Morris was moving out of his South Watt Avenue apartment due to "recent burglaries" of residents' cars at the apartment complex. While in the parking lot, Morris observed defendant and Johnny walking along the Jackson Highway and

---

[2] In *People v. Morales* (Oct. 29, 1993) C011311 (nonpub. opn.), filed this date, we reject Johnny's numerous claims of prejudicial error.

thought they were "acting suspicious" because they were looking around the parking lot and appeared nervous. After watching the brothers for a few minutes, Morris returned to his apartment and got a handgun for protection. He told his girlfriend there were "two guys acting funny in the parking lot," and he was going to "check it out."

When he returned to the parking lot, Morris saw defendant leaning against a brick wall, inquired what he was doing there, and asked where defendant's friend was. Defendant said he was alone. When Morris again asked about the whereabouts of defendant's companion, defendant replied that "he went to go get somebody, but that he was going to be right back." Morris told defendant about recent car burglaries at the apartment complex and directed him to wait for his friend in the street. When he heard defendant speak to someone, Morris backed away.

Morris then looked into several cars to see if any had been vandalized or burglarized. As he reapproached defendant, Morris saw Johnny lying down in the front seat of Bonnie Butterfield's car. Morris told defendant and Johnny to leave. The brothers walked a few feet, conversed in Spanish, and then turned and walked toward Morris. As Morris backed away, he saw defendant unzip his jacket. Feeling threatened, Morris drew his gun and told the brothers to "freeze." They turned and walked away.

Morris yelled for someone to call 911 and ran to the apartment of John Fitzgerald and Sean O'Brien, who had been victims of a previous automobile burglary.[3] Morris told them someone had broken into a car in the parking lot.

Fitzgerald went to the lot and saw that a car window had been smashed. He looked down an alley but did not see anyone. Then he walked out to Prairie Trail Way and saw defendant and Johnny jump out from behind some hedges. Fitzgerald told the brothers to come toward him and asked if they had anything to do with the car break-in. When they ran away, Fitzgerald chased after them.

O'Brien followed approximately 50 feet behind Fitzgerald. He told defendant and Johnny to stop, but they said "No, leave us alone," and kept running.

Bonnie Butterfield and her fiancé, Terry McFarland, lived at the apartment complex. They heard noises from the parking lot and heard someone

---

[3]Contrary to defendant's contention, no one contradicted Morris's assertion that he asked for someone to call 911. One witness merely testified Morris did not ask *him* to call 911. Another, who was inside his apartment at the time, simply did not recall hearing any such statement. Neither Bonnie Butterfield, Troy Morris nor John Fitzgerald actually called 911.

yelling about a break-in. Butterfield looked outside and saw some people circling her car. She asked McFarland to go see what was going on; he put on sweats and shoes, grabbed his truck keys and went outside.

O'Brien pointed in the direction defendant and Johnny had run, and McFarland got into his truck and drove after them. He pulled up on the sidewalk in front of the brothers at a residence on Thornhill.

Fitzgerald and O'Brien saw defendant and Johnny hitting McFarland through the open window of the truck.[4] Fitzgerald pulled Johnny off the truck, and O'Brien pulled defendant away. Defendant tried but failed to hit O'Brien, and O'Brien hit defendant once before falling to the side. O'Brien then heard a jacket unzip and saw defendant holding a knife. O'Brien yelled to the others that there was a knife. At this point, he thought McFarland grabbed a baseball bat.[5]

McFarland told defendant to drop the knife. Defendant responded by telling McFarland to drop the bat, and then lunged at McFarland, who stumbled back toward his truck. O'Brien went to McFarland and saw he had a fatal stab wound.

While this occurred, Fitzgerald was engaged in a fistfight with Johnny on the lawn. The next thing Fitzgerald remembered was O'Brien screaming that "somebody got killed." Fitzgerald got up, turned around, and was stabbed by defendant in his upper right arm and lower left side.

O'Brien grabbed McFarland's baseball bat, which was lying on the ground, and threw it to Fitzgerald. With the bat, Fitzgerald confronted defendant and Johnny at the front door of the residence on Thornhill and told defendant to drop the knife. Defendant knocked on the door of the house, but no one answered. Fitzgerald then repeated his demand that defendant drop the knife. When he refused to do so, Fitzgerald swung the bat and hit defendant and Johnny several times.

The brothers then charged at Fitzgerald and tackled him to the ground. Johnny grabbed Fitzgerald's arms and held them back while defendant stabbed him two or three times. Then, one of the brothers grabbed the bat and hit Fitzgerald in the face, knocking out his two front teeth. O'Brien came over and pulled Fitzgerald away.

---

[4] Drops of blood were later found on the truck seat cushion.

[5] McFarland played ball often, and it was not unusual for him to have a baseball bat in his truck. O'Brien told an officer at the scene that McFarland took the baseball bat with him when he exited his truck. At trial, O'Brien testified that his earlier statement was inaccurate and that McFarland got the bat after defendant pulled the knife.

When Morris arrived on the scene, he saw McFarland lying on the ground covered with blood. Morris pointed his gun at Johnny, who was holding the bat, and told him to drop it. Johnny complied, and O'Brien retrieved the bat. Morris then saw Fitzgerald trying to crawl away from defendant. Morris pointed his gun at defendant and told him to stay a safe distance away.

Folsom Police Officer Sheldon Sterling, who resided in the neighborhood, overheard the commotion. He jogged to the scene, shined his flashlight on Morris, identified himself as a police officer, and told the men to drop their weapons. O'Brien dropped the bat, and Morris placed his gun in his car. One of the brothers then picked up the bat and started to walk toward Sterling. Sterling ordered him to drop the bat, which he did. Defendant and Johnny then ran away.

Sacramento County Sheriff's Deputy Marcie Minter and trainee Kelly Osborne were en route to the scene when they saw defendant and Johnny running on Thornhill. As they saw the officers, the brothers pointed down Thornhill toward the stabbing scene. Then they walked past Minter, but she motioned them over and placed them in the back of the patrol car.

Dr. Monica Rocco examined Fitzgerald at the University of California, Davis, Medical Center and found stab wounds in his chest, left lower abdomen, right upper arm and posterior left flank. Although his wounds were life-threatening, Fitzgerald survived due to prompt medical intervention.[6]

Dr. Robert Anthony performed the autopsy on McFarland. He found two stab wounds, one in the right shoulder and the other in the right chest. The chest wound injured the third and fourth ribs, passed through the right lung, and cut the pulmonary vein. The injury caused death within 10 to 15 minutes.

The defense claimed, among other things, that the brothers did not have the intent to permanently deprive Butterfield of her car or property therein and that, when pursued and confronted by residents of the apartment complex, defendant and Johnny acted in self-defense. Evidence was introduced that, on the morning of December 2, Lisa Voorhies and her mother met defendant and Johnny at the brothers' apartment in West Sacramento and drove them to Voorhies's apartment complex on South Watt Avenue in Sacramento. The brothers had planned to stay the night. However, they changed their minds that evening and decided to leave. Voorhies's mother

---

[6]Fitzgerald testified he had not been drinking prior to the incident. However, a blood test performed during his treatment at the hospital indicated he had consumed alcohol.

was not home, so the brothers departed on foot. Approximately 20 minutes later, they returned to Voorhies's apartment and asked if Lisa had a screwdriver or a hanger. When she replied in the negative, the brothers departed stating they would take light rail home. Defendant testified that Johnny was intoxicated and broke into Butterfield's car simply to use it to drive home.

DISCUSSION

I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III

 Noting this case was tried on the theory that his accomplice, Johnny, broke into Butterfield's car with the intent to steal, defendant contends there is insufficient evidence to establish that Johnny entered the locked car with the intent to permanently deprive Butterfield of the vehicle or property therein. It follows, he claims, that his conviction for aiding and abetting automobile burglary (a felony) must be reversed, as must his murder conviction (which was premised on the felony-murder rule) and his attempted murder conviction (as to which the prosecution argued defendant had no right of self-defense because his victim was lawfully apprehending a felon (§ 197, subd. 4)). The contention fails because, as we shall explain, the requisite intent for automobile burglary may be inferred from the circumstances surrounding the break-in of a locked vehicle.

The jury was instructed that it had to determine whether Johnny's entry into Butterfield's car constituted burglary of a motor vehicle (§ 459; CALJIC No. 14.58 (1989 rev.)), attempted unlawful taking of a vehicle (§ 664; Veh. Code § 10851; CALJIC No. 14.36 (1989 rev.)), attempted joyriding (§§ 499b, 664; CALJIC No. 16.610 (1990 new)), or tampering with a vehicle (Veh. Code, § 10852; CALJIC No. 16.620 (1989 rev.)). The jurors were told that, to find burglary of a motor vehicle, they had to find: "1. A person entered an automobile when the doors were locked, and [¶] 2. At the time of the entry, such person had the specific intent to steal and take away someone else's property, and *intended to deprive the owner permanently of such property*." (CALJIC No. 14.58 (1989 rev.), italics added.)[9]

Defendant concedes there is sufficient evidence that a locked vehicle had been entered unlawfully and that Johnny broke into the car so defendant and

---

*See footnote, *ante*, page 1383.

[9]By instructing only with CALJIC No. 14.58, the trial court limited automobile burglary to an unlawful entry of a locked car with the intent to take someone's property and with the intent to permanently deprive the owner thereof. However, the information alleged that defendant and Johnny committed automobile burglary by unlawfully entering a locked vehicle

Johnny could take it. Indeed, defendant testified at trial that the purpose of the break-in was to use the car to return home to West Sacramento. He contends, however, that the brothers' "intent to unlawfully take the vehicle to drive home, even in the absence of an express intent to return it, does not prove an intent to permanently deprive the owner of the vehicle. Hence, the auto burglary conviction cannot be sustained."

The contention misses the mark because the jurors were entitled to disbelieve defendant's self-serving testimony and other evidence which suggested Johnny broke into the vehicle simply so the brothers could use it temporarily in order to get home. Instead, for reasons which follow, the jurors reasonably could conclude, based on the circumstances surrounding the break-in, that defendant and Johnny intended to permanently deprive the owner of her property when Johnny entered the automobile.

█ As defendant recognizes, an intent to permanently deprive someone of his or her property may be inferred when one unlawfully takes the property of another. (*People* v. *Butler* (1967) 65 Cal.2d 569, 573 [55 Cal.Rptr. 511, 421 P.2d 703]; *People* v. *Poindexter* (1967) 255 Cal.App.2d 566, 569 [63 Cal.Rptr. 332].) Likewise, an intent to permanently deprive someone of property may be inferred from an attempted taking.

█ Here, the break-in was committed late at night by an adult and his 17-year-old brother. Armed with a knife, defendant acted as a look-out while his accomplice, Johnny, entered a locked vehicle by breaking a window in an effort to take the car. As Johnny was lying inside the vehicle "[h]alfway on the seat and halfway on the floor," the plan was thwarted by a neighbor who observed the damage and yelled for someone to call 911. When caught in the act, defendant used deadly force in an attempt to avoid being apprehended.

Drawing on their " 'knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience' " (*People* v. *Fauber* (1992) 2 Cal.4th 792, 838-839 [9 Cal.Rptr.2d 24, 831 P.2d 249], quoting *People* v. *Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269,

---

with the intent to commit larceny or "any felony." (See Use Note to CALJIC No. 14.58 [the court should use a modification of CALJIC No. 14.50 if the intended felony is other than theft].) An attempt to drive or take a car in violation of Vehicle Code section 10851 constitutes a felony even if the perpetrator does not intend to permanently deprive the owner of the car. Hence, although the culprit does not intend to permanently deprive the owner of the car, the unlawful entry into a locked car with the intent to commit an act which violates Vehicle Code section 10851, a felony, constitutes automobile burglary because it constitutes an unlawful entry with the intent to *commit a felony*. Nevertheless, because the prosecution did not present this theory to the jury, and the jurors were not instructed thereon, we cannot rely on it to reject defendant's claim of error.

790 P.2d 676]), reasonable jurors could infer that this break-in of a locked vehicle was done with the intent to permanently deprive the owner of her property. (*Butler*, *supra*, 65 Cal.2d at p. 573; *Poindexter*, *supra*, 255 Cal.App.2d at p. 569.)

■ Defendant disagrees, arguing such an inference is not permissible with respect to the break-in of an automobile because the Legislature has enacted three separate statutes punishing the taking or use of an automobile without the owner's consent. Noting that "[o]ne entails intent to steal [section 487, subdivision 3 (grand theft automobile),] one entails intent to permanently or temporarily deprive the owner of title or possession [Vehicle Code section 10851 (unlawful driving or taking an automobile),] and one entails an intent to temporarily use [section 499b (joyriding)]," defendant contends "[t]hese statutes embody the Legislature's recognition that the mere taking of a vehicle does not demonstrate the taker's intent because an automobile—by its very nature—is the type of property which, unlike money, etc., is prone to taking for temporary as well as permanent use." It follows, defendant argues, that an intent to permanently deprive the owner of property cannot be inferred from the break-in and attempted taking of a locked automobile. We are unpersuaded.

That the Legislature has enacted separate crimes and punishments for different types of automobile takings does not preclude the trier of fact from concluding, based on the circumstances of the break-in of a locked vehicle, that the culprit intended to permanently deprive the owner of the car or property therein. The statutes governing the taking or driving of a vehicle, or the attempt to do so, simply establish different crimes *depending on the factual determination made by the trier of fact* as to the intent of the perpetrator in attempting to take or drive a motor vehicle.

For example, in *People* v. *DeLeon* (1982) 138 Cal.App.3d 602 [188 Cal.Rptr. 63], a coin dealer was driving on a public street when he was stopped and accosted by the appellants, who drove his car away and then abandoned it where it was recovered an hour later. (*Id.*, at p. 605.) Convicted of robbery, among other things, the appellants argued ". . . there was no robbery of the car because the evidence is insufficient to show that they intended to deprive the owner permanently of the car." (*Id.*, at p. 606.) The *DeLeon* court disagreed, explaining: "The fact the car was subsequently abandoned does not compel the conclusion that appellants intended to deprive the owner of the car only temporarily. Appellants' intent was to be inferred from circumstances and was a question of fact for the jury to decide." (*Ibid.*) Noting the car contained many valuable coins, the court observed: "The jury might reasonably conclude, for example, that appellants

intended to deprive the owner permanently of the car, but after discovering the valuable coins inside appellants concluded that they had better abandon the car as quickly as possible because the police would not treat this as a routine car theft." (*Ibid.*) In other words, *DeLeon* recognized that the taking of an automobile is evidence that the culprit intended to permanently deprive the owner of the car.

■ In arguing to the contrary, defendant in effect asks us to hold, as a matter of law, that the intent to permanently deprive the owner of a vehicle or property therein cannot be inferred from the break-in of a locked automobile. We decline to do so. If, as defendant suggests, intent to permanently deprive the owner of property cannot be inferred from the circumstances surrounding the break-in, then it would be impossible to prove that an unlawful entry into a locked car constitutes automobile burglary when, in cases such as this, the culprit is caught immediately after the entry. In fact, applying defendant's reasoning, it would be impossible to prove automobile burglary (and even car theft in violation of section 487 or a violation of Vehicle Code section 10851) when the culprit *actually succeeds in taking the vehicle* but is stopped before he or she has driven it a substantial distance or for a substantial time. Under defendant's theory, the defense could argue that the trier of fact cannot infer an intent to permanently deprive from the break-in and actual taking of the vehicle because it is possible the culprit simply might have intended to joyride (§ 499b). The Legislature could not have intended such an absurd result. (*People* v. *Clark* (1990) 50 Cal.3d 583, 605 [268 Cal.Rptr. 399, 789 P.2d 127]; *People* v. *Morris* (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843]; *In re Head* (1986) 42 Cal.3d 223, 232 [228 Cal.Rptr. 184, 721 P.2d 65].)[10]

Here, the jurors were presented with evidence concerning the circumstances of the break-in from which they could infer that the brothers intended to permanently deprive Butterfield of her automobile. The jurors also were presented with evidence of lesser culpability which, if found to be credible by the jury, could have created a reasonable doubt as to whether the break-in indicated an intent to permanently deprive the owner of property; and the jury was instructed on the alternatives of finding defendant guilty of lesser offenses supported by that evidence.

[10]Moreover, applying defendant's reasoning, it would be impossible for the People to prove residential burglary when a person is apprehended immediately after breaking into a home. Under defendant's analysis, because the Legislature has provided a separate statute for the punishment of those who merely commit misdemeanor trespass by, for example, entering and occupying real property or a structure of any kind (including an occupied residence) without the consent of the owner, the owner's agent, or the person in lawful possession (§ 602, subd. (*l*))—such as a transient who enters to find a place to sleep—the trier of fact could not infer from the break-in that the intruder entered with the intent to commit larceny or a felony. Such a conclusion makes no sense and is not compelled by the law.

Having heard the evidence, having observed the witnesses' demeanors, and having assessed their credibility, the jury reasonably could reject defendant's claim that, when Johnny broke into the locked vehicle, the brothers intended only to temporarily use the car without the owner's permission. This is not the typical joyride scenario where one, generally a juvenile, comes upon an unlocked car and impulsively decides to take advantage of the situation. Here, the break-in was committed late at night by an armed adult and his 17-year-old brother. After the brothers apparently planned the break-in, Johnny smashed the window of a locked car so the brothers could take it. When caught in the act, defendant used deadly force in trying to avoid being apprehended. Under these circumstances, the jury reasonably could conclude the brothers intended to permanently deprive the owner of the car if they had not been thwarted in their effort. (*DeLeon, supra,* 138 Cal.App.3d at p. 606; *Butler, supra,* 65 Cal.2d at p. 573; *Poindexter, supra,* 255 Cal.App.2d at p. 569.)[11]

Therefore, defendant's conviction for vehicle burglary is supported by substantial evidence.[12]

---

[11]This case is readily distinguishable from *People* v. *Gherna* (1947) 80 Cal.App.2d 519 [182 P.2d 331], upon which defendant relies. In *Gherna*, the appellant had been drinking and was involved in an accident in which he was struck by a car. Officers arrived at the scene and parked their patrol car " 'with the lights on floodlighting the accident and the red light pointing to the rear.' " When the officers left their car to investigate, the appellant (who earlier had attempted unsuccessfully to leave the scene by trying to get a ride from a motorist) got into the police vehicle and drove away. There is no indication the appellant broke into the patrol car. It apparently had been left unlocked with the keys inside. The appellant abandoned the vehicle approximately three miles away, but was apprehended before he got away. (*Id.,* at pp. 520-521, 523.) Relying in part on unpersuasive dictum in *People* v. *Neal* (1940) 40 Cal.App.2d 115, 117 [104 P.2d 555], the *Gherna* court held this evidence, including the fact the appellant abandoned the patrol car after driving just over three miles, was insufficient to support an inference that he intended either to permanently or temporarily deprive the owner of the vehicle. (80 Cal.App.2d at p. 525.) Contrary to defendant's claim, *Gherna* does not stand for the proposition that a break-in or taking of a car cannot constitute evidence of an intent to permanently deprive the owner of the vehicle. Rather, the *Gherna* court simply concluded that, under the unique circumstances presented there, the inference had been overcome by credible evidence of lesser culpability.

[12]*People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243], cited by defendant, does not compel a contrary result. In that prosecution for an alleged violation of Vehicle Code section 10851, the issue pertinent to this case was whether the trial court erred in denying the appellant's request for an instruction on joyriding (§ 499b) as a lesser included offense to the allegation as pleaded in the information. Although concluding that, in the abstract, section 499b is not a necessarily included offense within Vehicle Code section 10851, the Supreme Court held the trial court should have instructed on joyriding because "the charging allegation in [*Barrick*] does allege facts that necessarily include the former section within the latter." (33 Cal.3d at p. 135.) The court then rejected the People's argument that, because the vehicle's ignition had been tampered with, there was no evidence to justify an instruction on joyriding as a lesser included offense. (*Ibid.*) This unremarkable conclusion

IV-XIV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Raye, J., concurred.

A petition for a rehearing was denied November 23, 1993, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied Feburary 10, 1994. Mosk, J., was of the opinion that the petition should be granted.

---

does not stand for the proposition that a break-in of a locked car cannot give rise to an inference that the perpetrator intended to permanently deprive the owner of the car or property therein. Rather, *Barrick* simply holds that the jury must be given all appropriate options in determining the culprit's intent and corresponding guilt. Here, the jurors were given such options as they were instructed with attempted violation of Vehicle Code section 10851, attempted violation of section 499b, and violation of Vehicle Code section 10852, tampering with a vehicle.

*See footnote, *ante*, page 1383.