Filed 7/29/13  P. v. Price and Austin CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060993 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD233723) |
| KESHAWN LYNELL PRICE AND GEORGE V. AUSTIN, | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed as to Keshawn Lynell Price.  Affirmed with directions as to George V. Austin.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant Keshawn Lynell Price.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant George V. Austin.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Keshawn Price and George Austin each appeal from his judgment of conviction after the jury found Price guilty of count 3, assault (Pen. Code,[1] § 245, subd. (a)(1)) and Austin guilty of counts 1 through 5, as follows: robbery (§ 211; count 1); assault by means likely to produce great bodily injury (§ 245, subd. (a)(1); count 2); assault by means likely to produce great bodily injury (*ibid.*; count 3); and assault with a deadly weapon and by means of force likely to produce great bodily injury (*ibid.*; counts 4 & 5).[2] The jury also found true that Price committed count 3 and Austin committed counts 1 through 5 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The trial court sentenced Price to five years and Austin to 17 years in state prison.

Price on appeal contends the trial court erred and thus abused its discretion when it refused to sever his trial from Austin's trial and when it refused to bifurcate the gang allegations from the substantive charges. He also contends the court erred in failing to give sua sponte a unanimity instruction. Lastly, he contends the court erred and therefore abused its discretion when it ordered him to pay restitution jointly and severally with other codefendants.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Several others also were charged in connection with this incident.

As we explain, we reject each of these contentions and affirm Price's judgment of conviction.

Austin contends his robbery conviction in count 1 must be reversed for lack of substantial evidence. He also contends the trial court erred in failing to instruct sua sponte on simple theft as the lesser included offense of robbery and in instructing the jury on the gang enhancement.[3] Finally, Austin contends and the People agree that his abstract of judgment should be corrected.

As we also explain, other than correction of the abstract of judgment, we reject each of these contentions and affirm Austin's judgment of conviction.

FACTUAL AND PROCEDURAL OVERVIEW[4]

Heveen Toma managed the Moonlight Market (store) located within the territory of the East Side Skyline Piru criminal street gang (Skyline gang) in the Skyline neighborhood of San Diego. In the evening of April 5, 2011, store employee Mukhles Daud was working the register while Heveen, Heveen's cousin Karlos Toma and store employee Salwan Toma were busy loading cases of Hennessy liquor onto a truck parked in the store parking lot for transport to another location. As Karlos guarded the truck, Heveen, assisted by Salwan, used a dolly to take the cases from the storeroom, through

---

[3]    We note that Price joined in any and all contentions raised by Austin that would inure to his benefit and vice versa.

[4]    We view the evidence in the light most favorable to the judgments of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Certain portions of the factual and procedural history related to issues raised by defendants are discussed *post*, in connection with those specific issues.

3

the front door of the store, to the truck. Each case contained twelve 750 milliliter bottles of Hennessy, and each bottle sold for $30. Approximately 35 cases were loaded into the bed of the truck, and 20 smaller cases were loaded inside the truck's cabin.

The jury viewed video taken from multiple surveillance cameras at the store that showed a black vehicle driven by a man later identified as Austin back into a parking space in front of the store. Five men, including Austin, exited the car. As Heveen came through the front door of the store with a dolly loaded with cases of Hennessy, the surveillance video shows Austin and another man later identified as Norman Berry smacking the cases of Hennessy. Heveen testified the men loudly said, "'oh, this is mine'" and "'give me that'" as they did so. Heveen continued walking to the truck to finish unloading the cases and returned to the store. Meanwhile, Austin purchased a bottle of Hennessy.

When he came back outside, Heveen observed Austin and Berry in a loud tone say to Karlos, "where are you guys going with that" and "give me that" and "I want to take some of that," referring to the cases of Hennessy. Karlos responded, "You guys just have yourselves a good night. We're just doing our jobs." As Heveen loaded the cases of Hennessy onto the truck, Austin and Berry continued to ask where they were taking the Hennessy. Heveen testified he then went back into the store and told Salwan, "'hurry up'" and "'let's try to finish,'" because he was concerned Austin, Berry and the rest of their group would attempt to take the Hennessy.

4

Heveen next heard Austin and Berry say, "'this is Skyline,'" "'[w]e're going to follow you wherever you're going to go [with the cases]'" and "'this is our area.'" Heveen testified he associated these words and/or expressions with the fact that the men, including Austin and Berry, were part of a gang that was from the Skyline area, inasmuch as at the time of the incident Heveen had worked at the store for more than three years and knew gangs were located in the area. Berry also began "throwing gang signs up" as he and Austin paced back and forth in front of the store.

Heveen testified that just as they finished loading the Hennessy, Austin got into the black car and slowly moved it to another part of the store parking lot. Austin then exited the car and said, "'Now you're blocked in. You're not going to go anywhere." As this was occurring, Barry continued "throwing up . . . gang signs" and repeated "'this is Skyline'" and "'this is our area,'" and words to that effect.

After Austin threw a two-liter soda at Heveen and Karlos, Austin came around his car and said, "'This is our Area. You guys are not going anywhere. We're going to take your shit.'" Austin and Berry also said, "'this is Piru territory'" and repeated, "'this is Skyline.'" The two also made gang signs with their hands.

Heveen testified that Karlos told him to call the police. Heveen called 911, but was unable to get an operator on the line. Nonetheless, at Karlos's suggestion, Heveen pretended to speak to the police on his phone because he was fearful of being robbed and hoped Austin, Berry and the others would just leave.

5

Austin, Berry and the others then got back in the black car. Before Berry got into the car, Heveen testified Berry went to the passenger side of the car and appeared to retrieve something and put it in his back pocket, such as a weapon. Berry then said, "I got something for you." After they were all in the car, Heveen testified Austin revved the engine and, as also shown by the video, then drove the car towards Karlos, clipping him on the shin and causing him to fall onto the hood of the car.

As shown in the video and testified to by Heveen, Karlos then stood up on the hood of the car and stomped on the car's windshield. The windshield cracked. As the black car started backing up, Karlos jumped off the hood, took off his jacket and angrily said, "'Now come on. Get out [of] the car.'" The video shows Karlos then hitting the passenger side window of the car, which also was confirmed by Heveen's testimony.

The black car driven by Austin left the parking lot. Heveen testified the car quickly stopped next to a utility box, and the group of men then got out of the car and charged them. Heveen testified and the video surveillance from the store shows that Berry took a swing at Heveen, and Heveen swung back. Heveen also testified Austin had a knife estimated to be about five inches long in his hand when he got out of the car and came at Karlos, but Karlos grabbed a trashcan lid and used it as a shield to ward off the attack. As the other men were attacking Karlos, Austin went to the truck loaded with Hennessy, grabbed two cases and threw them to the ground. Austin then tried to open the cases.

6

After Austin threw a third case of Hennessy to the ground, Heveen testified a group of about 10 to 15 people, including Price, came on the scene from the direction of Skyline. Some of these people joined in the fight. Others started throwing bottles of Hennessy at Heveen and Karlos from one of the cases Austin had thrown to the ground. Austin threw a bottle of Hennessy at Karlos, but he missed and the bottle hit the ground and shattered. Price punched Karlos and unsuccessfully attempted to hit Karlos with a bottle.

During the melee, Karlos was knocked to the ground. As Karlos lay on the ground, he was kicked and punched, including by a man in a black shirt later identified as Laquan Jordan who used his fists to "pound[] away" at Karlos. At the same time Jordan was punching Karlos in the face, Austin tried to stab Karlos. Several others also kicked Karlos, including Price. Heveen testified that he also saw Price throw a bottle of Hennessy at Karlos while Karlos lay on the ground.

While Karlos appeared to be unconscious on the ground, people were yelling "beat his ass." In an effort to assist Karlos, Heveen punched Austin, who in turn swung the knife at Heveen but missed. After a woman punched Heveen in the face, he got angry, picked up a bottle of Hennessy and threw it at Jordan, who was still punching Karlos. The bottle struck Jordan in the chest.

Austin next ran to the driver's side of the black car and got inside. The others in the group followed, and the car driven by Austin left. Heveen saw Price and others run away. Heveen checked on Karlos, who lay motionless on the ground. As Heveen

approached, he could hear Karlos "was having trouble breathing." Karlos's face was bloody, and his nose appeared to be badly broken. Salwan testified Karlos's body was "shaking," and Karlos was unresponsive.

Because Heveen estimated he had waited about six minutes for dispatch to pick up his 911 call, Heveen called the El Cajon Police Department, who was in the process of transferring the call to the San Diego Police Department when Heveen flagged down a patrol car passing the store and reported the crime.

During the incident, Heveen was struck by three thrown bottles of Hennessy. Salwan and Mukhles also were struck by thrown bottles. Additionally, during the attack, Salwan testified he heard the words "Blood" and "Piru" being yelled by the attackers.

John Frazier testified he observed the attack from his vehicle while stopped at a stoplight near the store. From the car, he could smell something "strange in the air" and determined it was a "liquory" smell. He saw a group of African-American men trying to steal liquor from a parked truck that was being "frantically" defended by another man. Frazier said the group "viciously" attacked the man, including throwing bottles at him and kicking him while he lay on the ground. Frazier called 911 and then saw a group of men involved in the attack get inside a "dark-colored" sedan and speed away. Frazier followed the speeding sedan for a few miles in an unsuccessful attempt to obtain a license plate number.

Patricia Ennis testified she observed the attack from the bus she was driving. Surveillance video of the incident taken from cameras on the bus was shown to the jury.

8

Ennis stopped the bus and observed bottles being thrown by at least six African-American males at a man that she previously had seen yelling at occupants of a black car that was moving very slowly in the store parking lot. Shortly thereafter, Ennis saw the man who had been standing in the middle of the parking lot on the ground and observed several African-American men punching him. Ennis radioed dispatch and reported the attack. Ennis later told police she saw some of the men in the group take some of the bottles.

Karlos suffered numerous cuts and abrasions, and his broken nose required plastic surgery as a result of the attack. Karlos spent two or three days in the hospital following the attack.

Police at the scene observed several broken bottles and areas of liquid on the asphalt of the store parking lot. Police estimated there were eight broken bottles and 12 bottles missing from the cases. Heveen testified that 36 bottles of Hennessy were broken, damaged or missing as a result of the incident and valued the store's loss at about $1,000.

Police reviewed the video surveillance of the attack and recognized Austin as one of the attackers. Salwan and Mukhles each identified Austin in separate photographic lineups.

A few weeks later, Price returned to the store to make a purchase. Mukhles was working the cash register and recognized Price as one of the individuals involved in the April 5, 2011 attack. Police later reviewed the store's surveillance video and identified Price.

San Diego Police Detective Jon Brown testified as the prosecution's gang expert. Detective Brown was a member of the gang unit and, as both a detective and a patrol officer, had investigated over 200 crimes involving the Skyline gang. Additionally, Detective Brown contacted hundreds of Skyline gang members and reviewed arrest reports and field interviews related to the Skyline gang.

Detective Brown testified that the Skyline gang then had about 400 members, it has been in existence since the 1970's, it is a "Blood set," and its primary color is red. The Skyline gang is comprised of several smaller gangs, including one known as the O'Farrell Park gang. According to Detective Brown, the Skyline gang's primary rival is the Lincoln Park gang, also a "Blood set."

Detective Brown testified he was familiar with Austin based on his own contacts with Austin, his review of documents, including field interviews, and from speaking with other law enforcement. Based on that information and based on Austin's admission of being a gang member, Austin's gang-related tattoos including "8 Piru 0" across his chest and from his review of the surveillance video showing Austin making hand signs that were consistent with the Skyline gang, Detective Brown opined that Austin was a member of the Skyline gang, going by the monikers "Gee" and "Monkey Blood." Austin was known to associate with about 15 Skyline or O'Farrell Park gang members.

Detective Brown also opined that Price was a member of the Skyline gang and went by the monikers "Little Boolin YG" and "Baby L.K. Mad," with the "L.K." meaning "Lincoln Killer." Detective Brown reached this conclusion in part based on Price's gang-

10

related tattoos, including the tattoo "BIP GFO." According to Detective Brown, "BIP" meant "rest in peace" but with the "B" replacing "R" because Price was a "Blood" gang member, and GFO stood for "Greg from O'Farrell." Detective Brown testified that an individual named Gregory Harper had been a Skyline gang member killed by his own gang set. Price also admitted to law enforcement in October 2010—before the instant attack—that he was an O'Farrell Park gang member.

Given a hypothetical situation consistent with the facts involving the instant offenses in which four or five Skyline gang members came to a market located in their gang territory, harassed employees of the market and demanded alcohol while mentioning and/or displaying their gang affinity, and ultimately beat one of those employees while throwing gang signs, Detective Brown opined these hypothetical crimes were committed for the benefit of and in association with a criminal street gang.

In that instance, Detective Brown noted there was a clear "association because the gang members are acting with each other. They're telling the victims whatever gang set they're from, so they're not only assaulting them, but they're letting them know who it is, which is going to create fear in the community. [¶] So the gang members get status because they're putting in violent acts to up their status, and the gang gets the benefit because any time you get violent gang members, that reflects upon the gang and now the gang gets to be known as more violent, not only to rival gang members, but to community members that go to that market or just live in the area and happen to see it on the news."

11

Detective Brown further opined that in considering the facts of the same hypothetical, such conduct by the gang members would promote, further or assist criminal conduct by the gang members because in that hypothetical instance gang members are "working as a team; they're backing each other up. So even though one kind of starts to fight, they all jump in and they work as a team to have a group attack against the victims."

## DISCUSSION

A. *Price's Motion to Sever His Trial from Austin's Trial*

1. *Brief Additional Background*

Before trial, Price moved to sever his trial from the trial of Austin. Price contended that he would be "unduly prejudiced" by a joint trial because the evidence regarding the robbery in count 1 allegedly was "much greater with regard to Mr. Austin" than him and because he could be convicted "simply by his [Price's] association with Mr. Austin or with the Skyline Piru street gang."

During oral argument on the motion, Price contended that a joint trial involving him and Austin would be "highly prejudicial" to him because Price allegedly had a "limited role" in the attack. The People disagreed and argued that both Price and Austin were charged with nearly the same offenses from the same attack on the same victims, where the same evidence would be presented.

In denying Price's motion to sever, the trial court relied on section 1098 (discussed *post*) and noted factors to consider included cross-admissibility of evidence and whether

12

one of the defendants had a number of more serious charges not involving the other defendant. The court found those factors did not apply to the instant case because "everything that has been alleged occurred on April 5, 2011, and all but one of the counts involve allegations against both of the defendants."

The court found that based on the proposed evidence, the instant case "involves one continuum, one course of conduct. Although Mr. Price became allegedly involved at a later time than Mr. Austin, it still involves allegations relating to the same victims basically arising out of the same initial contact . . . . [¶] . . . [¶] And, hypothetically, it seems to me, based on the way the facts are described in the People's trial brief, even if I were to sever the [trials of] defendants, I would have to allow the People to present the entire sequence of events in order for the jury to understand the charges against Mr. Price, so it would basically be the same witnesses to the same evidence . . . . So I don't find that there is any basis for severing the defendants at this time because I believe the evidence is essentially going to be the same; the jury will be instructed as to the specific charges and allegations with regard to each of the two defendants. [¶] And, of course, they will have to consider each defendant individually and decide what he is guilty or not guilty of separately, and they'll be told that. So I don't believe there's any danger of undue prejudice sufficient to warrant a severance at this time, so I'm going to respectfully deny the request to sever Mr. Price from Mr. Austin at this time."

13

2. *Governing Law and Analysis*

"Section 1098 expresses a legislative preference for joint trials. The statute provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' [Citations.] Joint trials are favored because they 'promote [economy and] efficiency' and '"serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."' (*Zafiro v. United States* (1993) 506 U.S. 534, 537.) When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a '"classic case"' for a joint trial. [Citation.]

"The court's discretion in ruling on a severance motion is guided by the nonexclusive factors enumerated in *People v. Massie* (1967) 66 Cal.2d 899, 917, such that severance may be appropriate 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' (Fns. omitted.) Another helpful mode of analysis of severance claims appears in *Zafiro v. United States*, *supra*, 506 U.S. 534. There, the high court, ruling on a claim of improper denial of severance under rule 14 of the Federal Rules of Criminal Procedure, observed that severance may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or

14

innocence.' [Citations.] The high court noted that less drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice. [Citation.]

"A court's denial of a motion for severance is reviewed for abuse of discretion, judged on the facts as they appeared at the time of the ruling. [Citation.] Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial. [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40-41; see also *People v. Souza* (2012) 54 Cal.4th 90, 109 ["'If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder "'resulted in "gross unfairness" amounting to a denial of due process.'"' [Citations.]"].)

We conclude the trial court did not abuse its discretion in denying Price's motion for severance. As was the case in the decisions of our high court in *People v. Souza*, *supra*, 54 Cal.4th at page 109, *People v. Burney* (2009) 47 Cal.4th 203, 236, and *People v. Lewis* (2008) 43 Cal.4th 415, 452, here, the record shows this was a "'classic case'" for a joint trial inasmuch as Price and Austin, with one exception, were both charged for committing "'common crimes involving common events and victims'" (*People v. Lewis*, *supra*, at pp. 452-453).

Moreover, both Price and Austin were also charged with a gang-related enhancement under section 186.22, subdivision (b), and both were alleged to be part of the same (or a related or "sister set") criminal street gang. (See *People v. Conerly* (2009)

15

176 Cal.App.4th 240, 249 [when defendants are charged with the same offenses, "'a trial court *must* order a joint trial as the "rule" and *may* order separate trials only as an "exception"'"], citing *People v. Alvarez* (1996) 14 Cal.4th 155, 190; cf. *People v. Ortiz* (1978) 22 Cal.3d 38, 42 [ruling it was error for the trial court to deny motion to sever because the defendant "was not jointly charged with his codefendants in any count of the information"].)

Price nonetheless contends the court erred in denying his motion to sever his trial from Austin's trial because the evidence against him was "meager" when compared to the evidence against Austin, inasmuch as Price contends he did not join the attack until after Karlos was struck by the black car driven by Austin. We disagree. Looking at the facts as they appeared at the time of the trial court's ruling denying the motion to sever (see *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41), we conclude there was sufficient evidence before the trial court showing Price's involvement in the attack on Karlos, including testimony from at least three witnesses in the preliminary hearing that Price both struck and attempted to strike Karlos with a bottle of Hennessy and also kicked Karlos while he lay unconscious on the ground.

We also conclude that any alleged error in conducting a joint trial was harmless in the instant case because the evidence concerning the conduct of both Price and Austin would have been admissible in either a joint or a separate trial. (See *People v. Wickliffe* (1986) 183 Cal.App.3d 37, 41 [concluding joint trial was appropriate because "all codefendants, whether jointly charged or not, committed offenses at the same time and

16

place and as part of the same transaction" and because, as relevant here, "evidence concerning the conduct of both [codefendants] would have been admissible in either a joint or separate trial"]; *People v. Hernandez* (1983) 143 Cal.App.3d 936, 939, 940 [concluding joint trial was appropriate because the defendants were charged with various sexual offenses arising from a gang rape in which the defendants "jointly committed a series of crimes against the same victim at the same time and in the same place" and because "evidence concerning the conduct of all of the victim's assailants would have been admissible in either a joint or separate trial"].)[5]

B. *Motion to Bifurcate Gang Allegations from Substantive Charges*

Price contends he was denied a fair trial when the court refused to try the gang allegations separately from the substantive offenses brought against him.

1. *Additional Background*

Before trial, Austin moved to bifurcate the section 186.22, subdivision (b)(1) gang enhancement allegation attached to counts 1 through 5 from the substantive charges in those counts. Price joined in that motion. After lengthy argument by counsel, the court denied each defendant's motion, ruling in part as follows:

"I think the *Hernandez* case is a very informative case -- *People [v.] Hernandez* at 33 Cal.4th 1040 -- because it's within the last eight years or so . . . and it's from the California Supreme Court. [¶] There are gang cases in which there is conflict between rivals; there are cases in which gang allegations occur where the victims have nothing to

_____

5    For the same reasons, we also reject Price's related contention that the trial court erred when it refused to empanel separate juries for him and Austin.

17

do with gangs and are not gang members. There are different types of gang-related cases, and the *Hernandez* case itself, that also involved an allegation of robbery.

"And [defense counsel] argues there's no evidence of gang -- there's no evidence of intent when they pulled up. I can't say there's no evidence without hearing the evidence. But clearly the People are going to be relying on and proving intent and gang affiliation or gang intent circumstantial evidence, and the jury is going to be instructed at the end of trial, if there are two reasonable interpretations, one points to innocence and one points to guilty, then they must accept the interpretation consistent with innocence.

"But that's very different from saying that there is no evidence of something. The evidence is circumstantial; it's for the jury to decide what it proves. That's the court's obligation during in limine hearings to try the case and decide whether it's the defense version that's true or the People's version. Obviously they are two very different versions, and there may be three very different versions. I don't know. But certainly the People's version was all of this was gang related.

"Now, in the *Hernandez* case, the facts there would indicate to somebody unfamiliar with gangs that the initial contact and demand for property had nothing to do with gang activity.

"In the *Hernandez* case, two people were sitting in their Honda, parked in front of one of their homes, and the defendants approached the passenger side of the car and asked one of the two for a cigarette. Now, obviously that by itself would not be indicative of gang activity. She handed one of the defendants a cigarette, and then he

18

said, 'I need another cigarette.  You'd better give me another cigarette.'  She said she had no more, and he demanded a dollar, and then for the first time he injected gangs.  He said, 'You don't know who you're dealing with.'  He told her she was dealing with Hawthorn Little Watts -- probably the name of the gang -- and she suspected that he was referring to a gang.  He said that if they don't get the money, they were going to take the Honda, the car they were sitting in.

"The defendants [in *Hernandez*] opened the passenger door, pulled her from the car, the other defendant grabbed her by the neck, choked her and took the necklace while Mr. Hernandez, the codefendant, pointed a knife at her neck.  And then she screamed, 'Somebody call 911.'

"So there's a situation where no rival gangs were involved at all.  It was simply gang members using their membership in gangs to commit a robbery on innocent victims.

"Now, the gang expert who testified in *Hernandez* testified -- and this is at 33 Cal.4th 1046 -- that gang members frequently reveal the name of their gang during the commission of crimes because they want the victims to know who committed the offense, and they give multiple goals:  to gain respect for the gang, to instill fear in the community and to increase their own level of respect within the gang.

"And so we can see from the *Hernandez* case, the commission of the crime itself, although on the surface at least before gangs were mentioned, would seem to have very little to do with gang activity in the context of the expert testimony indicated that it was

19

part of a pattern that gangs follow in committing crimes against innocent victims, not gang rivals.

"So I'm just using those facts as an example with how it's not always black and white as to the exact motivations of particular defendants and particular crimes, which is why we have juries to decide and why we have rules of evidence to allow the People who do have the burden of proof beyond a reasonable doubt to at least attempt to prove their case. If they can't, the defendants will be found not guilty; if they can, they will be found guilty. But that's an issue for the jury.

"Now, in the *Hernandez* case, the court discusses . . . several things relating to gang evidence, but in regard to bifurcation, [it cites to] . . . *People v. Calderon* . . . it's 9 Cal.4th 69. That was the case that talked about bifurcated trials for prior convictions.

"And the *Hernandez* court distinguishes *Calderon* by referring to other cases which discuss the fact that a prior conviction of a defendant relates to the status of the defendant as a convicted felon. The court in *Hernandez* goes on to say, 'By contrast, the criminal street gang enhancement is attached to the charged offense and is by definition inextricably intertwined with that offense,' so less need for bifurcation generally exists with a gang enhancement than with a prior conviction allegation. [¶] . . . [¶]

"The bottom line is they conclude at the bottom of page 1050 onto page 1051 on 33 Cal.4th, quote, 'Much of the gang evidence here was relevant to the charged offense. Indeed, defendant Hernandez himself injected his gang status into the crime. He

identified himself as a gang member and attempted to use that status in demanding money from the victim.

"Although [the codefendant] did not specifically identify himself as a gang member, the evidence showed the robbery was a coordinated effort by two gang members who used gang membership as a means to accomplish the robbery. [The] expert testimony helped the jury understand the significance of Hernandez's announcement of his gang affiliation, which was relevant to motive and the use of fear.' [¶] . . . [¶]

"Finally, the court says . . . '[a]ny evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison that it threatened to sway the jury to convict regardless of defendants' actual guilt. Accordingly, defendants did not meet their burden "to clearly establish that there was a substantial danger of prejudice requiring that the charges be separately tried."' [¶] . . . [¶]

"So evaluating the People's theory of the case and the offer of proof -- and that's all I can go by at this point is the offer of proof and keeping in mind what the defense theory of the case is -- I find that there is not a sufficient basis to conclude that there is a substantial danger of prejudice if the allegations are not bifurcated, so I'm going to deny the request for bifurcation of the gang allegations at this time."

2. *Governing Law and Analysis*

As the trial court here recognized in its well-reasoned discussion of the issue, a court has discretion to bifurcate trial issues, including enhancements. (See *People v.*

*Hernandez* (2004) 33 Cal.4th 1040, 1048; *People v. Calderon* (1994) 9 Cal.4th 69, 74-75.)  "In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal.  [Citation.]  But evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.  [Citations.]  To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary.  [Citation.]"  (*People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1049-1050.)  "Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'"  (*Id.* at p. 1050.)

These rules guide our analysis.  Here, the trial court properly exercised its discretion when it denied defendants' motion to bifurcate because the gang evidence clearly was relevant to the charged offenses of both Price and Austin.  The gang enhancement codified in section 186.22, subdivision (b)(1) was attached to each of the charged offenses brought against Price and Austin.  Moreover, we note that like the defendant in *People v. Hernandez*, the record in the instant case shows that Austin and

22

others in his group clearly and unequivocally made their gang status and affiliation relevant when they began flashing gang signs and making gang-related statements such as "Piru," "Blood," "this is Skyline" and "this is our area" when first demanding store employees give them the Hennessy and later, during the attack.

Indeed, the evidence in the record shows that the store was located in the heart of the Skyline gang's territory and that as soon as Austin and his group rushed the store, at least 10 to 15 other people—including Price, who was a member of the same or related gang as Austin—joined in the attack. The record further shows that several Skyline gang members lived in homes in close proximity to the store. This evidence supports the inference that the attack on the store employees was a coordinated effort by the gang.

Thus, the gang evidence was admissible to explain not only the reason these 10 or 15 additional people joined in the attack, as further explained by the People's gang expert that members of a gang are expected to back each other and put in work for the gang, but also to show the intent and motive of the group, including Price and Austin, in connection with the robbery of the Hennessy and/or the assault of the store employees who, despite the group's threats, refused to turn over the Hennessy. (See *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1050.)

That the jury heard testimony unrelated to the attack—including evidence of predicate acts of other members of the Skyline gang offered to prove the section 186.22, subdivision (b)(1) gang enhancement and evidence of prior contacts between law enforcement and Price and/or Austin in connection with their gang membership and

23

affiliation—does not mean the trial court improperly exercised its discretion in denying bifurcation. As recognized by our Supreme Court in *People v. Hernandez*, *supra*, 33 Cal.4th at page 1050, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." On this record, we conclude Price did not satisfy his burden to show a "substantial danger of undue prejudice" when the court denied his bifurcation motion. (*Ibid.*)

We also agree with the People that any purported error by the trial court in refusing to bifurcate the gang enhancement allegations from the substantive charges was harmless under any harmless error standard of review. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) As noted *ante*, most of the gang evidence admitted at trial was relevant to the substantive charges brought against Price and Austin on the issues of motive, intent and even identity.

In addition, the court instructed the jury regarding the limited use of the gang evidence, including that such evidence was not admissible to show a defendant was a person of "bad character" or had a "disposition to commit crime." We presume the jury followed the court's instructions (see *People v. Wilson* (2008) 44 Cal.4th 758, 803), and there is nothing in the record in the instant case to suggest otherwise. In fact, given that Price admitted he was a member of the Skyline gang and given the connection between

24

the gang evidence and the substantive offenses as discussed *ante*, it appears the jury

followed the court's instructions inasmuch as the jury acquitted Price of counts 1, 4 and 5.

C. *Unanimity Instruction*

Price next contends the trial court erred when it failed to give sua sponte a

unanimity instruction in connection with count 3, assault by means likely to produce

great bodily injury.

1. *Governing Law*

The California Constitution requires a unanimous jury verdict to support a

criminal conviction. (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132; see also Cal.

Const., art. I, § 16.) "The [unanimity] instruction is intended to eliminate the danger that

the defendant will be convicted even though there is no single offense which all the jurors

agree the defendant committed." (*People v. Sutherland* (1993) 17 Cal.App.4th 602, 612.)

Thus, when the evidence suggests there is more than one discrete crime, the prosecution

must elect a specific crime or the trial court must sua sponte instruct the jury on

unanimity of the decision. (*People v. Russo*, *supra*, at p. 1132.)[6]

Significant to the instant case, a unanimity instruction is not required when the

"continuous conduct" rule applies, such that the alleged acts are so closely connected that

they are considered to be part of the same transaction. (*People v. Stankewitz* (1990) 51

---

6       CALCRIM No. 3500, the unanimity instruction, provides:  "The defendant is charged with *<insert description of alleged offense>* [in Count ___ ] [sometime during the period of _____ to _____ ].  [¶]  The People have presented evidence of more than one act to prove that the defendant committed this offense.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

25

Cal.3d 72, 100.) This well-recognized exception applies "when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*Ibid.*; cf. *People v. Wolfe* (2003) 114 Cal.App.4th 177, 185 [noting a trial court is required to give a unanimity instruction when the acts are fragmented by time and space].)

In *People v. Flores* (2007) 157 Cal.App.4th 216, 222-223, the court held no unanimity instruction was required in connection with the defendant's conviction for assault with a deadly weapon among other crimes because according to witnesses, the defendant's firing of seven rounds from a semiautomatic weapon occurred "without indicating a significant delay" between the individual discharges and thus the evidence showed the defendant's multiple acts of firing the weapon involved a continuous course of conduct. (See also *People v. Dieguez* (2001) 89 Cal.App.4th 266, 275 [concluding no unanimity instruction was required in the defendant's conviction for making false material statements in support of a workers' compensation award because the series of statements made by the defendant to his doctor occurred at the same appointment, "they were successive, compounding, and interrelated to one another," and they were made with the single objective of obtaining workers' compensation benefits]; cf. *People v. Diedrich* (1982) 31 Cal.3d 263, 282-283 [concluding court erred in failing to give unanimity instruction because evidence showed the defendant engaged in discrete acts of bribery in two unrelated transactions but was only charged with and convicted of a single count of bribery].)

2. *Analysis*

Here, the evidence that Price threw a bottle of Hennessy at Karlos, kicked Karlos and attempted to strike Karlos while holding a bottle of Hennessy in his hand involved a single, continuous transaction. Indeed, all the conduct for which Price was criminally charged took place at the same location, and the acts comprising the assault occurred merely seconds apart and involved the same victim, Karlos. We thus reject Price's contention that the court was required to give sua sponte the unanimity instruction. (See *People v. Melendez* (1990) 224 Cal.App.3d 1420, 1429 ["The 'continuous course of conduct' exception—when the acts are so closely connected that they form one transaction—is meant to apply not to all crimes occurring during a single transaction but only to those 'where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto.' [Citations.]"], disapproved on another ground as stated in *People v. Majors* (1998) 18 Cal.4th 385, 408.)

In any event, we conclude any alleged error in failing to give the unanimity instruction was harmless under any harmless error standard of review. (See *Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) The record shows the jury was instructed with CALCRIM No. 3515, as modified, which provided, "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." The jury also was given CALCRIM No. 3550, which as modified provided in part, "Your verdict on each

count and any special findings must be unanimous. This means that, to return a verdict, all of you must agree to it. Do not reach a decision by the flip of a coin or by any similar act."

In addition, the record shows that Price offered the same defense to the criminal acts and conduct for which he was charged, namely that he was not the person in the video seen throwing bottles of Hennessy and that he was not involved in the attack on Karlos. Clearly, the jury rejected this contention, and the evidence proffered by Price in support of it, when it found him guilty in count 3 of assault in violation of section 245, subdivision (a)(1). Thus, any such alleged error by the court in not instructing the jury sua sponte with the unanimity instruction was harmless.

D. *Award of Restitution*

Heveen testified that about 36 bottles of Hennessy were broken, damaged or missing following the incident at the store. Heveen, the manager of the store, stated the store incurred losses of about $1,000 as a result of the incident.

1. *Brief Additional Background*

The probation report prepared following Price's conviction on count 3 stated that Heveen claimed total losses on behalf of the store of $1,100, equal to $900 for the loss of Hennessy and $200 for cleanup.[7] The probation report recommended restitution of $1,100 be paid jointly and severally to the store by Price, Austin and the others involved

---

[7] Karlos did not seek reimbursement for any of his expenses or damages as a result of the attack.

28

in the attack. At sentencing, the court without objection imposed restitution in this amount to be paid jointly and severally by "any codefendants" in this case.

2. *Governing Law and Analysis*

"Section 1202.4, subdivision (f) provides for a direct restitution order 'in every case in which a victim has suffered economic loss as a result of the defendant's conduct.' The order is to be for an amount 'sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct.' (*Id.*, subd. (f)(3).)" (*People v. Brasure* (2008) 42 Cal.4th 1037, 1074-1075.) A "victim" for purposes of section 1202.4, subdivision (f) includes a "business" or "commercial entity when that entity is a direct victim of a crime." (See § 1202.4, subd. (k)(2).) A court has authority to order that codefendants share joint and several liability for victim restitution. (See *People v. Neely* (2009) 176 Cal.App.4th 787, 800; see also *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.)

Price contends the court erred when it held him and any other codefendants jointly and severally liable to pay restitution to the store of $1,100 because he was not convicted of any crime related to property damage of the store (i.e., unlike Austin, who was convicted of robbery) and because at most the evidence supports a finding he was personally responsible for perhaps one broken bottle of Hennessy (i.e., the one Price threw at Karlos).

We conclude Price forfeited this claim by failing to raise it in the trial court. (See *People v. O'Neal* (2004) 122 Cal.App.4th 817, 820.) Indeed, "all 'claims involving the

29

trial court's failure to properly make or articulate its discretionary sentencing choices' raised for the first time on appeal are not subject to review. [Citations.]" (*People v. Smith* (2001) 24 Cal.4th 849, 852.)

In any event, assuming the imposition of the restitution fine falls within the exception to the forfeiture rule (see *People v. Smith*, *supra*, 24 Cal.4th at p. 852 [no forfeiture when an error involves a pure question of law and can be corrected independent of any factual issues presented by the record at sentencing]), we still conclude the trial court properly ordered Price to pay restitution to the store jointly and severally with the other codefendants. Although Price, unlike Austin, was not convicted of robbery, the jury did find Price guilty of assault, which included Price's attack of Karlos with one or more bottles of Hennessy. Equally important, the jury also made a true finding that Price committed the assault for the benefit of a criminal street gang, in violation of section 186.22, subdivision (b)(1). We thus conclude the trial court properly found Price's involvement with other Skyline gang members in the attack caused the store to suffer economic loss. (See § 1202.4, subd. (f).)[8]

---

8      We note that section 1202.4, subdivision (j) provides that restitution paid "shall be credited to any other judgments for the same losses obtained against the defendant arising out of the crime for which the defendant was convicted." The word "defendant" in subdivision (j) of section 1202.4 has been interpreted to include "codefendants." (See *People v. Arnold* (1994) 27 Cal.App.4th 1096, 1100.) "Thus[,] if the combined payments made by multiple defendants exceed the victim's loss, each defendant would be entitled to a pro rata refund of any overpayment." (*Ibid.*) As such, there is no risk here that the store will receive more in restitution from the codefendants than that ordered by the trial court.

E. *Sufficiency of the Evidence and Austin's Robbery Conviction*

Austin contends there was insufficient evidence to support his robbery conviction on count 1 because he never intended to "steal" or "take" the Hennessy, but rather "armed" himself with the Hennessy "because it was available" for use in the fight.

In deciding the sufficiency of the evidence, we draw all reasonable inferences from the record to support the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We do not weigh the evidence or decide the credibility of the witnesses. (*Ibid.*)

"Robbery is the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear." (§ 211; see *People v. Hall* (1967) 253 Cal.App.2d 1051, 1054.) "Robbery requires the specific intent to deprive the victim of his or her property permanently." (*In re Albert A.* (1996) 47 Cal.App.4th 1004, 1007.) "The specific intent with which an act is performed is a question of fact." (*Id.* at p. 1008.) However, the "intent required for robbery . . . is seldom established with direct evidence but instead is usually inferred from all the facts and circumstances surrounding the crime. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 643.) "[A]n intent to permanently deprive someone of his or her property may be inferred when one unlawfully takes the property of another." (*People v. Morales* (1993) 19 Cal.App.4th 1383, 1391.) "If any substantial evidence supports the trier of fact's finding on this issue, we will not disturb it." (*In re Albert A.*, *supra*, at p. 1008.)

31

Significant to the issue raised by Austin, the People were not required to prove that Austin took the Hennessy with the intent to retain it, or even use (i.e., drink) it or for the purpose of gain; rather, a taking for purposes of robbery occurs "even if the defendant's sole intent is to destroy the property." (*People v. Green* (1980) 27 Cal.3d 1, 58, overruled on another ground as stated in *People v. Martinez* (1999) 20 Cal.4th 225, 234, 235-239.)

Here, viewing the evidence in the light most favorable to the judgment (see *People v. Bloyd* (1987) 43 Cal.3d 333, 346-347), we conclude there is sufficient evidence in the record to support the finding that Austin intended permanently to deprive the store of its property (i.e., the Hennessy). Even before the fight, the record shows that Austin and others from his group were demanding that they be given some of the Hennessy being loaded onto the truck by store employees. The record also shows that as store employees continued to load the Hennessy cases, Austin became more insistent, demanded to know what they were doing with the Hennessy, said "this is Skyline" and threatened to follow the truck loaded with the Hennessy.

The record also shows that Austin next got back into the black car he had driven to the store and moved it so that the loaded truck was now prevented from leaving the parking lot. After that, Austin exited his car and said, "Now you're blocked in. You're not going to go anywhere." Austin then walked around his car and said, "This is our area. You guys are not going anywhere. We're going to take your shit." In addition, during

32

this confrontation, Austin threw gang signs and told the concerned store employees, "this is Piru territory" and "this is Skyline."

This evidence, which we conclude is substantial, supports the finding that Austin acted with the requisite intent to permanently deprive the store of its property once the fight began between the Skyline gang members and others associated with the gang, on the one hand, and the store employees on the other, when Austin pulled out a five-inch knife and attacked Karlos and then went to the truck that was being guarded by Karlos, picked up at least three cases of Hennessy and threw the cases onto the asphalt pavement; he also threw at least one bottle of Hennessy.

Although Austin does not dispute other elements of his robbery conviction, we note this same evidence also supports the taking finding (see *People v. Hill* (1998) 17 Cal.4th 800, 852 [noting that the "'taking element of robbery has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot'" and noting that to "satisfy the asportation requirement for robbery . . . 'it is not necessary that the property be taken out of the physical presence of the victim'" and that "slight movement" is sufficient to satisfy the asportation requirement]) and the finding that the taking occurred by means of "force or fear" (see § 211; see also *People v. Wright* (1996) 52 Cal.App.4th 203, 210 [noting that the "force" required for robbery must be at least "a quantum more than that which is needed merely to take the property . . . of the victim"]; *Miller v. Superior Court* (2004) 115 Cal.App.4th 216, 222 [noting that the force or fear

element of robbery is satisfied when the defendant uses force or fear (i) to acquire initially the victim's property and/or (ii) to retain, escape with or destroy it]).

F. *Theft as a Lesser Included Offense of Robbery*

Austin also contends the court erred when it failed sua sponte to instruct the jury on theft as a lesser included offense of robbery in count 1.

It is settled that in criminal cases, even in the absence of a request, a trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 149.) The general principles of law include instructions on lesser included offenses if there is a question about whether the evidence is sufficient to permit the jury to find all the elements of the charged offense. (*Ibid.*) "'"Theft is a lesser included offense of robbery, which includes the additional element of force or fear."'" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1331.)

However, a trial court is not obligated to instruct the jury on theories that do not have substantial evidentiary support. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Ibid.*) Evidence is substantial if it would permit the jury to conclude the lesser offense was committed but the greater offense was not. (*Ibid.*)

34

Here, based on the evidence summarized *ante*, we conclude on this record that no reasonable jury could find that Austin committed a simple theft rather than a robbery because the evidence in the record overwhelmingly shows that Austin used force and/or fear when he mentioned his gang affiliation, threw up gang signs at the same time he demanded the employees of the store turn over the Hennessy and wielded a five-inch knife immediately before he threw the cases of Hennessy onto the pavement.

However, even assuming the trial court erred in failing sua sponte to instruct the jury that it was entitled to find theft as a lesser included offense of robbery, we conclude that error was harmless. "The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165.) 'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' (*Id.* at p. 177.)" (*People v. Thomas* (2012) 53 Cal.4th 771, 814, fn. omitted.)

Here, any evidence that Austin committed a mere theft (i.e., did not use force or fear in the taking of the Hennessy) was relatively weak when compared to the substantial

35

and significant evidence (summarized *ante*) in the record supporting the finding that Austin took (i.e., destroyed) the Hennessy by use of force and/or with fear. Our conclusion the error was harmless is buttressed, moreover, by the fact the jury found that Austin committed four counts of assault by means likely to produce great bodily injury and assault with a deadly weapon and by means of force likely to produce great bodily injury, which findings strongly suggest that the jury believed force was utilized in the taking of the property.

G. *Gang Enhancement Jury Instructions*

Austin next contends, and the People concede, that the trial court erred when it omitted a portion of the gang enhancement jury instruction defining the term "pattern of criminal gang activity" that is used in determining whether an organization or association is in fact a "criminal street gang." The parties dispute, however, whether that error was harmless.

1. *Additional Background*

Using an "[e]xact copy of CALCRIM No. 1401, except [with] adaptations" that was then applicable, the court instructed the jury on the gang enhancement as follows:

"If you find the defendant guilty of the crimes charged in Counts One through Five, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang. You must decide whether the

36

People have proved this allegation for each crime and return a separate finding for each crime.

"To prove this allegation, the People must prove that:

"1.  The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang;

"AND

"2.  The defendant intended to assist, further, or promote criminal conduct by gang members.

"A *criminal street gang* is any ongoing organization, association, or group of three or more persons, whether formal or informal:

"1.  That has a common name or common identifying sign or symbol;

"2.  That has, as one or more of its primary activities, the commission of murder, attempted murder, assault, robbery, firearms or firearms offenses;

"AND

"3.  Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity.

"In order to qualify as a *primary* activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.

"The crimes, if any, that establish a pattern of criminal gang activity, need not be gang-related.

"The People need not prove that the defendant is an active or current member of the alleged criminal street gang.

"If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved.

"You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed.

"The People have the burden of proving each allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that the allegation has not been proved."

The court did not, however, instruct on the meaning of the term "pattern of criminal gang activity."  CALCRIM No. 1401 states this phrase means:

"1.  [The] (commission of[,] [or]/ attempted commission of[,] [or]/ conspiracy to commit[,] [or]/ solicitation to commit[,] [or]/ conviction of[,] [or]/ (Having/having) a juvenile petition sustained for commission of):

"*<Give 1A if the crime or crimes are in Pen. Code, § 186.22(e)(1)–(25), (31)– (33).>*

"1A.  (any combination of two or more of the following crimes/[,][or] two or more occurrences of [one or more of the following crimes]:) _____ *<insert one or more crimes listed in Pen. Code, § 186.22(e)(1)–(25), (31)–(33)>*;

"[OR]

"*<Give 1B if one or more of the crimes are in Pen. Code, § 186.22(e)(26)–(30).>*

"1B.  [at least one of the following crimes:] _____ *<insert one or more crimes from Pen. Code, § 186.22(e)(1)–(25), (31)–(33)>*;

"AND

"[at least one of the following crimes:] _____ *<insert one or more crimes in Pen. Code, § 186.22(e)(26)–(30)>*;

"2.  At least one of those crimes was committed after September 26, 1988;

"3.  The most recent crime occurred within three years of one of the earlier crimes;

"AND

"4.  The crimes were committed on separate occasions or were personally committed by two or more persons."

The record shows that the parties specifically discussed the predicate acts that would be admitted to show a "pattern of criminal gang activity," with the defense arguing only two such predicate acts should be admissible and the People arguing that they should be allowed to introduce evidence of three such acts.  The court agreed with the People in ruling as follows:

"Penal Code [section] 186.22, subdivision parentheses small (f) defines a criminal street gang as an 'ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission' -- and the language used is 'of one or more of the criminal acts enumerated in paragraphs 1 to

39

33, inclusive of Penal Code [section] 186.22 subdivision (e),' and then there's some additional language.

"[¶] . . . [¶]

"There are a number of cases that have admitted many more than two predicate acts. It is subject to a[n Evidence Code section] 352 objection. The fact that one of the defendants involved in a predicate act also was seen associating with the defendant in the current case, in my view, does not trigger rejection under Evidence Code section 352 as being unduly prejudicial.

"The fact that the predicate acts do not involve the particular defendants in this case, I think, is a good sign in terms of reducing prejudice versus predicate acts that did involve the two defendants, even though they are usable.

"So to summarize, I don't see a basis for excluding the People's evidence of three predicate acts based on their representation, the offer of proof made by the People."

The record shows that on the heels of this ruling, the People proffered the testimony of their gang expert, Detective Brown. He testified the primary activities of the Skyline gang included "murders, shootings, robberies, drug deals, stolen cars, burglaries, financial crimes such as counterfeiting [and] fake I.D.'s[.]"

Detective Brown opined that Skyline gang members "either individually or collectively [have] engaged in a pattern of criminal street gang activity." Specifically, he testified as follows about an incident that occurred on January 12, 2009 that led to the conviction of Skyline gang member Jeovani Jackson:

"I believe it was January of '09, Jorkim Rose, who was a rival Lincoln Park gang member, was walking down 54th and Imperial, he's confronted by four black males, one of the black males asks him 'what's up?' He doesn't immediately recognize him, but when he turned around, one of the black males tells him -- Skyline Black males tells him 'I'll smoke you right here.' [¶] And he realized he knows that suspect, which turned out to be Jeovani Jackson, from doing jail time with him on three different stents. [¶] Jeovani Jackson shoots Jorkim four times: once through the neck, once in the chest, and I believe in the back and buttocks area. [¶] Seandell Jones, who was an O'Farrell Park gang member, was subsequently I.D.'d in that as one of the other black males."

Marked as exhibit 10 was a certified copy of Jackson's criminal conviction, which was based on his guilty plea of assault with a deadly weapon in violation of section 245, subdivision (a)(2) and his admitting the gang enhancement and great bodily injury and weapons allegations.

Detective Brown next was asked about a man named Charles Neal. Detective Brown testified that Neal was a documented Skyline gang member and specifically testified as follows about an incident that took place on June 9, 2007 for which Neal was convicted of murder:

"Well, June 9th is a significant day because it goes back to 6/9 day, June 9th, which is specific to a Skyline subset. [¶] On June 9th, there was a party -- like a carnival up at M.L.K. Block, 6500 Block of Skyline. There was a bunch of Skyline O'Farrell gang members hanging out. A car drove through the parking lot, and the car was

41

occupied by a group of rival Lincoln Park Blood Gang members. They mad-dogged him, gave them mean stares as they passed through the lot.

"The car subsequently parked, a bunch of rival gang members confronted the Skyline gang members at the carnival. Police intervened, and the two groups separated.

"Maurice Tucker, who is from O'Farrell, goes by Tuck Bo, and Charles Neal, who goes by Choo-Choo from Skyline, were very upset of the fact that Lincoln Park Bloods would come into Skyline gang territory and disrespect them by showing up at this carnival when they know that that's Skyline, not Lincoln Park. [¶] So Mr. Tucker and Mr. Neal decided to go out riding, put in work. They subsequently -- they had a previous contact with a Lincoln Park gang member by the name of Stephen Cleveland a couple months prior at a Little Wayne concert. They knew Mr. Cleveland lived over at the 200 block of 65th Street, which is in Skyline's area. They drove down to Mr. Cleveland's house, saw him hanging out, confronted him, subsequently shot and killed him."

The record shows that marked as exhibit 11 was a certified copy of Neal's criminal conviction of October 2010 for the murder of Cleveland. The record also shows that Tucker also was convicted for that crime in August 2011.

Finally, Detective Brown testified as follows about the criminal activity of Skyline gang member Adrian Cody:

"In November of 2009, Adrian Cody, who was a Skyline gang member, Joseph Brown, who is a Skyline gang member -- I'm sorry. No -- O'Farrell Park gang member -- Leon Moore, who was an O'Farrell Park gang member, and Diamond Barbie, who is a

42

Skyline gang member, drove to a medical marijuana place, a medical marijuana distribution . . . co-op, Mr. Cody stayed in the car, Mr. Brown, Moore, and Barbie all entered the store. [¶] Mr. Moore and Brown had handguns, they robbed the distillery of 25 jars of marijuana. While Barbie and Moore were stealing the marijuana, Mr. Brown was pistol-whipping the customers and the employees. They subsequently fled the store, got into the getaway car which was driven by Mr. Cody. One of the clerks followed the car, the car subsequently crashed. [¶] Mr. Brown, Mr. Moore and Mr. Barbie were arrested at the scene or in the close proximity of it. The two guns and the medical marijuana were recovered from the vehicle. [¶] Mr. Cody left paperwork -- probation paperwork, and his DNA was left on the air bag to the car, and he was subsequently convicted of the crime as well."

Marked as exhibit 12 was a certified copy of Cody's criminal conviction of aiding and abetting a robbery in violation of section 211.

The record shows that during closing argument, the prosecutor discussed each of these predicate acts in connection with his argument that the Skyline gang engaged in a pattern of criminal activity. Specifically, the prosecutor told the jury that the Skyline gang "exist[s] to commit criminal acts, and they thrive on violent acts, and you heard about some of those: Charles Neal, a known associate of Mr. Austin, committed a murder, and you heard a little bit about the context of that murder, that it was a murder related from some perceived disrespect by the murderers; you heard about Jeovani Jackson, a rival of Skyline in which Mr. Jackson, I believe, shot at the victim in that

43

particular case, not killing him. You heard about Adrian Cody, the Skyline gang member with O'Farrell Park gang members who robbed the marijuana dispensary for money and marijuana. These are all part of their enumerated patterns of criminal activity."

Austin's counsel in his closing did not address whether the Skyline gang engaged in a "pattern of criminal gang activity" for purposes of being a "criminal street gang." Price's counsel, however, discussed the three predicate acts presented by the People, but he did so not with respect to the issue of "pattern of criminal gang activity" but rather with respect to whether the People had proved beyond a reasonable doubt that the Skyline gang engaged in sufficient "primary activities":

"[Defense Counsel:] The District Attorney presented three, what they call, predicate acts. That's these blue folders that we have. One of them is a case from 2009, January 2009; one is a case from 2007, and one is a case from -- again 2009. [¶] 'In order to qualify as a *primary activity*, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.' How would you ever prove that? If you wanted to establish that murder was a primary activity of the street gang and you knew that an occasional act of murder committed by one or more persons who happen to be members of the group is not enough, what kind of evidence would you want? [¶] Well, you would probably want a lot of evidence about activities, about crimes. You would probably want a list of them, specifics. You'd want dates, you'd want defendants. You'd want all kinds

44

of evidence to establish that a particular crime was not just an occasional act committed by one or more persons who happen to be members of the group.

"Did you get any of that through Detective Brown? I don't recall any of that evidence being presented to you other than he said that's -- in his opinion, these crimes are one of the principal activities, and that's all he did. He didn't go any further." (Italics added.)

### 2. *Governing Law and Analysis*

"'We have consistently held that when a trial court fails to instruct the jury on an element of a special circumstance allegation, the prejudicial effect of the error must be measured under the test set forth in *Chapman v. California*[, *supra*,] 386 U.S. 18, 24.' [Citation.]" (*People v. Mil* (2012) 53 Cal.4th 400, 409-410; see also *People v. Scott* (2001) 91 Cal.App.4th 1197, 1210 [noting that "'[a]n instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence'"]; *Neder v. United States* (1999) 527 U.S. 1, 9 [applying harmless error standard to instructional error omitting element of an offense].) Under *Chapman v. California*, an appellate court may find the error harmless if, after conducting a thorough review of the record, the court determines beyond a reasonable doubt that the jury verdict would have been the same absent the error. (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)

"In determining whether instructional error was harmless, relevant inquiries are whether 'the factual question posed by the omitted instruction necessarily was resolved

adversely to the defendant under other, properly given instructions' [citation] and whether the 'defendant effectively conceded the issue.' [Citation.] A reviewing court considers 'the specific language challenged, the instructions as a whole[,] the jury's findings' [citation], and counsel's closing arguments to determine whether the instructional error 'would have misled a reasonable jury . . .' [citation]." (*People v. Eid* (2010) 187 Cal.App.4th 859, 883.)

In looking at CALCRIM No. 1401, we note the jury was specifically instructed that it could not find a "pattern of criminal gang activity" "unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed." Moreover, the jury was also told that the People have the burden to prove each allegation of the enhancement beyond a reasonable doubt and that if the People did not meet this burden, it was required to find the gang enhancement had not been proved.

What is more, the record shows there were three predicate acts proffered by the People. Neither Austin nor Price contend that any of the three predicate acts do *not* meet the criteria for establishing a "pattern of criminal gang activity" as provided in section 186.22, subdivision (e) and, in any event, our independent review of this issue confirms that the three predicate acts do in fact satisfy subdivision (e) of section 186.22.[9]

---

9    Subdivision (e) of section 186.22 provides in part: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by

In light of the argument of the prosecutor during closing regarding the three specific predicate acts proffered by the People to prove a "pattern of criminal gang activity" and the finding of the jury that the People proved at least two such acts beyond a reasonable doubt (see § 186.22, subd. (e)), we conclude the trial court's error in failing to instruct on the meaning of "pattern of criminal gang activity" in then-applicable CALCRIM No. 1401 to establish the Skyline gang was a "criminal street gang" within the meaning of the law was harmless beyond a reasonable doubt. (See *Chapman v. California*, *supra*, 386 U.S. at p. 24.)

H. *Abstract of Judgment*

Austin contends, and the People agree, that his abstract of judgment must be corrected because it currently reads he was convicted of "Assault W/Deadly Weapon" on counts 2, 3, 4 and 5, whereas the verdict forms read Austin was convicted of "assault by means likely to produce great bodily injury" in counts 2 and 3 and of "assault with deadly weapon/force likely to cause GBI [great bodily injury]" in counts 4 and 5. The verdict forms track the language of the information. We thus will order the abstract of judgment be corrected.

---

two or more persons: [¶] (1) Assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245. [¶] (2) Robbery, as defined in Chapter 4 (commencing with Section 211) of Title 8 of Part 1. [¶] (3) Unlawful homicide or manslaughter, as defined in Chapter 1 (commencing with Section 187) of Title 8 of Part 1."

## DISPOSITION

The trial court is directed to correct the abstract of judgment of Austin to show he was convicted of "assault by means likely to produce great bodily injury" in counts 2 and 3 and of "assault with deadly weapon/force likely to cause GBI [great bodily injury]" in counts 4 and 5. The trial court is further directed to forward a copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgments of conviction of Price and of Austin are affirmed.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.

48