Filed 6/30/22  P. v. Trujillo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANDREW LIONEL TRUJILLO, III<br><br>    Defendant and Appellant. | H047126<br>(Santa Clara County<br>Super. Ct. No. C1802825) |

A jury convicted defendant of several charges stemming from two commercial truck thefts.  Defendant's appeal raises sufficiency of the evidence claims, evidentiary and instructional error, and judicial and prosecutorial misconduct.  We reject all but defendant's claim that his conviction for taking a police vehicle (with intent to *permanently* deprive the owner of possession) lacked evidentiary support; as we will explain, defendant is entitled to an acquittal on that count.  We also agree with defendant that the trial court erred by denying his request for a restitution hearing, as required by Penal Code section 1202.4.  We will reverse the judgment with directions.

## I.  BACKGROUND

On July 18, 2018, officers arrested defendant at the Pacific Pride gas station in San Jose, where he and another man (whom officers were unable to positively identify) were pumping diesel fuel into two large vessels in the back of a stolen Ryder box truck.  A shed on the premises housed the computer system for the fuel pumps.  The shed was

unlocked and the pumps used by defendant had been set to manual mode. Defendant was arrested at the scene on an unrelated warrant.

Some three months later on October 9, officers were alerted to a stolen Freightliner truck parked behind a Target store also in San Jose. Defendant, who was in the driver's seat with the engine running, did not respond when ordered to exit the truck. Officers entered the cab and ordered defendant to turn off the engine. Instead defendant drove the truck over a small embankment and into a loading bay, injuring both officers, before fleeing on foot. Defendant was apprehended at the scene and restrained inside the back of a patrol car. While officers were inspecting the damaged truck, defendant moved undetected to the driver's seat of the patrol car and drove away. One of the officers pursued defendant onto a nearby highway but lost sight of him. The patrol car was recovered in nearby Hayward, and a tactical team was alerted to defendant hiding in a nearby warehouse. Defendant was ultimately apprehended after leaving the warehouse in a third stolen truck.

A criminal information charged defendant with offenses involving both incidents. Counts 1 and 2 relate to the July 18 thefts: Taking or unauthorized use of a 2016 International Truck belonging to Ryder Truck Rental. (Veh. Code, § 10851, subd. (a); count 1), and second degree burglary of the Pacific Pride gas station (Pen. Code, §§ 459, 460, subd. (b); count 2). The remaining counts relate to the October 9 incident: Taking or unauthorized use of a 2019 Freightliner truck belonging to Golden Gate Trucking (Veh. Code, § 10851, subd. (a); count 3); taking or unauthorized use of a police vehicle (Veh. Code, § 10851, subd. (b); count 4); two counts of resisting or deterring an officer by force (Pen. Code, § 69, subd. (a); counts 5 and 6); possessing burglary tools (Pen. Code, § 466; count 7); possessing tear gas with a prior conviction (Pen. Code, § 22810, subd. (a), a misdemeanor; count 8); possessing methamphetamine (Health & Saf. Code, § 11377, subd. (a), a misdemeanor; count 9); and possessing drug paraphernalia (Health & Saf. Code, § 11364, a misdemeanor; count 10).

2

The case was tried in May 2019.  The prosecution called officers who interacted with defendant on both dates; a manager from the Freightliner dealership; the owner and the lessee of the Ryder truck; and the gas station manager.  Stipulations were admitted in evidence regarding the methamphetamine found in the Freightliner truck and defendant's two prior felony convictions.  Defendant did not present other evidence.  Trial counsel argued that the prosecution failed to prove the gas station burglary; the officers' identification of defendant as the man in the Freightliner truck was unreliable; and to the extent defendant was the individual arrested in the Target parking lot, the evidence did not show that he used force to resist the officers.

A jury found defendant guilty on all counts.  Defendant was sentenced under Penal Code section 1170, subdivision (h)(5)(B) to six years in county jail, composed of the upper term of four years on count 4 (theft of the patrol car) and consecutive eight-month terms on counts 1, 2, and 3 (the truck thefts and the gas station burglary).  The court imposed concurrent three-year upper terms for counts 5 and 6 (resisting officers using force).  Defendant was ordered to pay $5,872 to the gas station for the stolen gas and $51,810 to the Freightliner dealership for damage to the Freightliner truck.

## II. DISCUSSION

### A. ASSERTED ERROR RELATED TO THE GAS STATION BURGLARY

#### 1. *Sufficiency of the Evidence*

Defendant argues the burglary conviction is supported by insufficient evidence; specifically, whether he or his alleged accomplice had the requisite knowledge and/or ability to enter the computer shed and manipulate the system to pump free gas.  Instead, he argues the evidence "strongly suggested the person who committed the burglary had a key to the lock on the computer room, the combination to the lock on the storage shed, and the specialized knowledge required to manipulate the computer system" to steal the gas.

3

Sufficiency claims are reviewed for substantial evidence. We "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Rowland* (1992) 4 Cal.4th 238, 269.) We presume the existence of every fact which a jury could reasonably deduce from the evidence in support of the judgment. (*Johnson*, at p. 576.)

City of San Jose police officer Rajiv Parmar testified that he was dispatched to the gas station around 4:00 a.m. on July 18 after a report of suspicious activity and a suspicious vehicle. Officer Parmar testified that when he arrived at the gas station, defendant and another man were standing between the Ryder truck and pumps 7 and 8, and the men were pumping diesel fuel into two large vessels located in the back of the box truck.

The manager testified that the pumps were operated by a computer system located in a small shed on the premises. He explained that each pump corresponds to a switch in the shed that can be adjusted manually between off, automatic, and manual, with the setting shown by an indicator light. A pump in manual mode can be operated without payment, and the pumps are normally in manual mode only when they are being serviced. Photographs showed the computer system housed in a metal box mounted on the inside wall of the shed. The switches and circuitry for each pump are numbered 1 through 8, and are readily visible upon entering the shed. The photographs also showed a booklet atop the metal box, which the manager testified contains instructions on "[h]ow to troubleshoot the box and everything else."

4

The manager described that the computer shed is secured with a cylinder key lock, and an adjacent storage shed on the premises is secured with a combination lock. When he arrived at the station around 12:30 p.m. on July 18, both sheds were unlocked and pumps 7 and 8 were in manual mode. Business records for July 18 showed three manual transactions for pump 7 and four manual transactions for pump 8 between 2:42 a.m. and 4:31 a.m., totaling approximately 1,600 gallons of fuel. That amount of fuel was recovered from the vessels in the Ryder truck.

Defendant retrieved his identification from the cab of the Ryder truck for Officer Parmar. More than 20 keys were found on a key ring in a bag, also in the cab of the truck. Several appeared to be master truck keys (including one for the truck's ignition) and five or six keys looked like padlock keys. Evidence was also admitted that the Ryder truck was stolen sometime after the close of business on July 17. Items had been removed from the back of the truck and the vessels containing fuel had been placed there.

The crime of burglary is defined as entering a structure "with intent to commit grand or petit larceny or any felony." (Pen. Code, § 459.) When a person is found in possession of property stolen in a burglary, corroborating evidence that the person also committed the burglary need only be slight. (*People v. McFarland* (1962) 58 Cal.2d 748, 754–755.) Here, defendant was convicted of stealing the Ryder truck. Items had been removed from the back of the truck; two vessels capable of storing large quantities of fuel had been placed in the back of the truck; and defendant was actively stealing diesel fuel when Officer Parmar arrived at the gas station. Business records showed that sometime before 2:42 a.m. pumps 7 and 8 had been set to manual mode, which required entry into the computer shed. Defendant was in possession of multiple keys, including one used to steal the Ryder truck and several padlock keys. That evidence is sufficient to support the burglary conviction.

Defendant emphasizes the manager's testimony that the computer system is not "an industry standard system" and was "built from the ground up" for the station; the

system is "complex" and the manager is the only person "with a specialized knowledge necessary to work the toggles." Defendant also emphasizes that both the computer and storage sheds were open when the manager arrived on the scene, and neither lock appeared to have been tampered with. Notwithstanding that testimony, a rational juror could reasonably find that defendant or an accomplice had the ability to and did in fact gain access to the computer shed without damaging the lock, and then manipulated the switches controlling pumps 7 and 8. The jury also could have rejected an inference that defendant or his accomplice opened the storage shed (in addition to the computer shed), in light of the fact that the manager arrived at the gas station more than eight hours after Officer Parmar was dispatched to the scene; the manager testified that other employees generally visit the gas station every two days to deliver fuel; and no evidence was offered that the manager was the first (or only) employee to visit the gas station after defendant was apprehended.

2. *Excluded Opinion Testimony*

The prosecution moved in limine to exclude the manager's lay opinion that the burglary was "an inside job." Defendant proffered that the manager would describe the system as "incredibly complex[,] and only someone with knowledge of how they work could manipulate them in such a way as to pump for gasoline." He argued the manager was the prosecution's only witness "that can testify to the workings of the machinery of the shed," and his opinion was relevant to the prosecution's burden to prove defendant entered the shed and manipulated the pumps. The prosecutor countered that the manager could testify regarding the complexity of the pumping system, but his opinion that the burglary was "an inside job" was ultimately a decision for the jury. The trial court granted the prosecution's motion on that basis.

Evidence Code section 800 limits nonexpert opinion testimony to "such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear

6

understanding of his testimony." In contrast, expert opinion testimony is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) A trial court's rulings on the admissibility of lay opinion and expert opinion testimony are reviewed for abuse of discretion. (*People v. Leon* (2015) 61 Cal.4th 569, 600 [lay opinion]; *People v. McDowell* (2012) 54 Cal.4th 395, 426 [expert testimony].) Reversal is not warranted unless the trial court " 'exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Relying principally on *People v. Sanchez* (2016) 63 Cal.4th 665 and *People v. Vang* (2011) 52 Cal.4th 1038, defendant argues that rendering an opinion on an ultimate fact is not a basis to deny relevant expert testimony. He argues the manager qualified as an expert because he had "specialized knowledge pertaining to the inner-workings of the machinery located in the computer room," and his opinion would have helped the jury decide whether the burglary was committed by someone with inside knowledge. We agree that opinion testimony may touch upon an ultimate fact, but defendant's authorities are inapposite. *Vang* involved the scope of expert opinion testimony in gang cases, where it is well settled that " '[e]xpert opinion that a particular criminal conduct benefited a gang' " is admissible. (*Vang*, at p. 1048.) *Sanchez*, also a gang case, addressed expert opinion based on testimonial hearsay, which is not an issue in this case. (*Sanchez*, at pp. 670–671).

Regardless of whether the manager could have been qualified as an expert regarding the gas station's computer system,[1] we see no abuse of discretion on this

---

[1] In the trial court, defendant did not dispute the prosecutor's characterization of the manager's opinion as lay testimony. He did not seek to qualify the manager as an expert, request that the opinion be admitted as expert testimony, or ask the court to reconsider the in limine ruling after cross-examining the manager.

record. While the workings of the computer system itself may be complex, the manager's testimony about the movement of switches was not. Using photographs, the manager identified the numbered switches and explained how they functioned. He also described a troubleshooting manual located on top of the control box. Based on that testimony, the manager was in the same position as the jury to assess whether defendant or an accomplice was capable of changing the switches to manual mode. (*People v. Spence* (2012) 212 Cal.App.4th 478, 509, citing *People v. Wilson* (1944) 25 Cal.2d 341, 349 [expert opinion on an ultimate issue is appropriate where the issue " 'cannot be further simplified and cannot be fully tried without hearing opinions from those in a better position to form them than the jury' "].)

Nor was defendant denied due process or deprived of the right to present a complete defense under the federal Constitution. The trial court allowed the manager to testify to all underlying facts which would support a conclusion that the burglary was an "inside job," including that the storage shed on the property appeared to have been opened by someone who knew the lock combination and that the computer shed appeared to have been opened by someone with a key to the padlock. Trial counsel then presented the "inside job" theory to the jury in closing argument.

3. *Instructing on Aiding and Abetting*

Defendant asserts instructional error related to aiding and abetting liability for the gas station burglary. We review this claim of legal error de novo. (*People v. Code* (2004) 33 Cal.4th 1158, 1208.)

The jury was instructed with the elements of burglary applicable here: "To prove the defendant is guilty of [burglary], the People must prove that: [¶] 1. The defendant entered a structure; [¶] AND [¶] 2. When he entered a structure, he intended to commit theft." (See CALCRIM No. 1700.) The jury was instructed on aiding and abetting liability using CALCRIM No. 400 and CALCRIM No. 401 because the prosecutor argued that the gas station burglary was committed by either defendant or an accomplice.

8

CALCRIM No. 400 states: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." CALCRIM No. 401 requires the People to prove that "*before or during the commission of the crime*, the defendant intended to aid and abet the perpetrator in committing the crime." (Italics added.)[2] Thus, CALCRIM No. 401 instructed the jury to look to defendant's intent before or during the burglary which, under CALCRIM No. 1700, was complete upon the perpetrator's entry into the computer shed.

Defendant argues the trial court erred by failing to instruct with CALCRIM No. 1702, either sua sponte or during deliberations in response to a question by the jury foreperson. CALCRIM No. 1702 applies specifically to aiding and abetting burglary: "To be guilty of burglary as an aider and abettor, the defendant must have known of the perpetrator's unlawful purpose and must have formed the intent to aid, facilitate, promote, instigate, or encourage commission of the burglary *before the perpetrator finally left the structure*." (Italics added.) Defendant contends CALCRIM No. 401

_____

[2] In relevant part, CALCRIM No. 401 provides: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

9

allowed the jury to find him guilty of burglary by aiding and abetting based on his intent at the time he was found pumping the gas, rather than either before or during the time a perpetrator was inside the computer shed.

CALCRIM No. 1702 differs from CALCRIM No. 401 in that it provides for aider and abettor liability in burglary cases where the defendant forms the intent to aid and abet after a burglary is completed (i.e., after the perpetrator enters a structure). The bench notes to CALCRIM No. 1702 cite *People v. Montoya* (1994) 7 Cal.4th 1027 as authority for the instruction. *Montoya* decided "at precisely what point—the perpetrator's entry into the structure, his or her departure from the structure, or some other point—the acts constituting the crime of burglary terminate for the purpose of aiding and abetting." (*Id*. at p. 1041.) The Supreme Court rejected the argument that aider and abettor liability in burglary cases requires "the requisite intent to commit, encourage, or facilitate the commission of the burglary *prior to or at the time the perpetrator entered the dwelling*." (*Id*. at p. 1032, italics in original.) When the perpetrator makes several entries and exits into a structure during the course of a single burglary, "the aider and abettor may be liable if he or she, with knowledge of the perpetrator's unlawful purpose, forms the intent to commit, encourage or facilitate commission of the offense at any time prior to the perpetrator's final departure from the structure." (*Id*. at p. 1046.) The court reasoned that the perpetrator's felonious intent continues during the course of an ongoing burglary involving multiple entries, such that " '[t]he individual who happens on the scene after the initial entry, becomes aware of the perpetrator's unlawful purpose, and intentionally assists during the subsequent entries, aids and encourages commission of the offense as surely as if that individual's knowledge had preceded the perpetrator's initial entry.' " (*Ibid*.)

Under the circumstances presented here, it was unnecessary to instruct with CALCRIM No. 1702 in addition to CALCRIM No. 401. As *Montoya* makes clear, CALCRIM No. 1702 is concerned with aider and abettor liability where a defendant

10

comes upon an ongoing burglary. Defendant does not argue (nor was evidence offered at trial) that a burglary was in progress inside the computer shed when he arrived at the gas station. Nor did the jury question (to which the court responded "yes") require the court to give the additional instruction. The question was, "If we find the defendant may not have actually entered the control room but aided/abetted whomever did, may we find the defendant guilty of item # 1 of [CALCRIM No.] 1700 … Item 1. The defendant entered a structure." The question conveyed that defendant may have aided and abetted a perpetrator who entered the computer shed, not that defendant's intent to aid and abet was formed *after* the perpetrator left the shed.

The bench notes to CALCRIM No. 1702 describe a sua sponte duty to give the instruction when "the defendant is charged with aiding and abetting a burglary and there is an issue about when the defendant allegedly formed intent to aid and abet." To the extent defendant (and the Attorney General) regard the comment as imposing a duty to instruct here, we observe that bench notes are not binding statements of law. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 155 fn. 32 ["bench notes are not authority for legal principles"]; see also *People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7 [jury instructions "are not themselves the law, and are not authority to establish legal propositions or precedent"].) A sua sponte duty to instruct with CALCRIM No. 1702 may arise under circumstances such as those in *Montoya*, but they are not present here.

### B. ASSERTED ERROR RELATED TO THE FREIGHTLINER THEFT

#### 1. *Instructing on Eyewitness Certainty*

Three officers identified defendant in court as the man in the Freightliner truck. Defendant argues the trial court erred by instructing the jury it could consider the degree of certainty in evaluating eyewitness identification of defendant.

The jury was instructed with CALCRIM No. 315 regarding eyewitness identification evidence. The instruction identifies several factors to consider in

11

evaluating identification testimony, including "[h]ow certain was the witness when he or she made an identification?"[3] Defendant did not ask that the instruction be modified to omit reference to witness certainty.

Defendant argued in his opening brief that witness certainty is not a reliable indicator of an accurate identification, and instructing on certainty therefore violated his due process rights under the state and federal constitutions by lessening the prosecution's burden of proof and impeding his ability to present a defense. The Supreme Court rejected those very arguments in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), decided after defendant's opening brief was filed. In *Lemcke*, the court concluded the certainty factor in CALCRIM No. 315 does not lessen the prosecution's burden of proof, as it does not equate a witness's certainty with accuracy, nor suggest that an identification from an eyewitness who has expressed certainty is presumed to be accurate. (*Lemcke*, at p. 657.) The court observed that witness certainty is only "one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony." (*Ibid*.) The instruction "leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in [the instruction]." (*Ibid*.) The

---

[3] Other factors relevant to a witness's identification include: "• Did the witness know or have contact with the defendant before the event? [¶] • How well could the witness see the perpetrator? [¶] • What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, [and] duration of observation[, and <insert any other relevant circumstances>]? [¶] • How closely was the witness paying attention? [¶] • Was the witness under stress when he or she made the observation? [¶] • Did the witness give a description and how does that description compare to the defendant? [¶] • How much time passed between the event and the time when the witness identified the defendant? [¶] • Was the witness asked to pick the perpetrator out of a group? [¶] • Did the witness ever fail to identify the defendant? [¶] • Did the witness ever change his or her mind about the identification? • Are the witness and the defendant of different races? [¶] • [Was the witness able to identify other participants in the crime?] [¶] • [Was the witness able to identify the defendant in a photographic or physical lineup?]" (CALCRIM No. 315.)

12

court held that CALCRIM No. 315 does not impede the ability to present a complete defense or otherwise violate due process. The instruction does not prevent a defendant from calling an expert in eyewitness identification or cross-examining the eyewitness regarding the identification. (*Lemcke,* at pp. 660–661.)

In his reply brief, defendant notes the comment in *Lemcke* that the witness certainty factor "has the potential to mislead jurors" (*Lemcke*, *supra*, 11 Cal.5th at p. 665), and the Supreme Court referred the issue to the Judicial Council "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Id*. at p. 647.) He argues the *Lemcke* court implicitly acknowledged that some juries may have been misled to equate certainty with accuracy, and that this is such a case.

We agree that while the *Lemcke* court found no constitutional violation in the use of CALCRIM No. 315, it acknowledged that the instruction "tends to reinforce" the "common misconception" that eyewitness confidence correlates with the reliability of an identification. (*Lemcke*, *supra*, 11 Cal.5th at p. 853.) The court directed that trial courts omit the certainty factor from CALCRIM No. 315 except on the request of the defense until the Judicial Council evaluates ways to modify the instruction to avoid juror confusion.

Defendant argues his claim was not forfeited at trial in 2019 because a request to modify the instruction would have been futile in light of settled precedent at the time. Without reaching the question of forfeiture,[4] we reject defendant's claim on the merits

---

[4] We note that by the time of defendant's 2019 trial, the Supreme Court had signaled in two cases that grounds might exist in a particular case to omit the certainty factor from the pattern instruction. In 2016 the court found no error in instructing with CALJIC No. 2.92 (the predecessor to CALCRIM No. 315) in a case involving both certain and uncertain identifications. (*People v. Sanchez* (2016) 63 Cal.4th 411, 462.) The *Sanchez* court advised that "[a]ny reexamination of our previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications." (*Ibid*.) In 2018 the court granted review in *Lemke* specifically to decide

because the case did not rest on any purported correlation between witness certainty and the accuracy of the identification of defendant as the individual in the Freightliner truck. Nothing in the record here demonstrates the jury was misled by the instruction. The prosecutor argued that defendant was identified by the driver's license left behind in the truck, by the three officers at the scene, and by both video footage and still photos admitted in evidence. She did not refer to witness certainty in her argument, and the record does not suggest the officers had any difficulty identifying defendant. Sergeant Mathis, Officer Adgar, and Officer Cuellar identified defendant as the man in the Freightliner truck who fled on foot, was subdued, arrested, and placed in Officer Cuellar's patrol car. Only Sergeant Mathis's testimony mentioned certainty: in response to the prosecutor's question, he confirmed he was "certain" defendant was the man seated in the truck because he recognized defendant's face, even though at trial defendant was wearing glasses and his hair and beard were different.

We conclude the prosecutor's isolated reference to certainty in questioning Sergeant Mathis did not meaningfully bolster the identification, and the prosecutor did not rely on the certainty concept or instruction to prove defendant's identity. The encounter Sergeant Mathis described was not fleeting. He physically engaged with defendant for several seconds inside the truck, and they made eye contact. He also handcuffed defendant and placed him in Officer Cuellar's patrol car. And he saw defendant a third time when defendant drove close by him in Officer Cuellar's patrol car. Officer Adgar identified defendant as the man he encountered in the truck when he climbed into the cab behind Sergeant Mathis. Officer Cuellar identified defendant as the man he saw exiting the Freightliner truck. Officer Cuellar pursued defendant on foot, and

---

whether "instructing a jury with CALCRIM No. 315 that an eyewitness's level of certainty can be considered when evaluating the reliability of the identification violate[s] a defendant's due process rights."

14

"[got] on top of him and [held] him down" until he was handcuffed. Officer Cuellar stated he recognized the photograph on defendant's expired driver's license (found in the Freightliner truck) as the same person he interacted with in the Target parking lot. Defendant was also connected to the abandoned patrol car and apprehended in a third stolen truck.

    2. *Sufficiency of Evidence to Show Use of Force*

Defendant argues insufficient evidence supports his convictions for resisting Sergeant Mathis and Officer Adgar by using force or violence, specifically that the evidence did not show he intentionally drove the truck in a manner that could constitute use of force. Defendant claims he was "startled awake" by the officers who entered the Freightliner truck; his "immediate reaction in this confused and frightened state was to start manipulating buttons on the dashboard"; and putting the truck in drive "caused the truck to fall off an embankment" into the Target delivery bay. Defendant argues for an inference that he was unaware of the embankment because he arrived at the parking lot only shortly before the officers, and the drop into the loading bay was not immediately visible. He also argues against any inference that putting the truck in drive would apply force or create a risk to officers already inside the cab.

A person "who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty," is guilty of resisting or deterring an officer. (Pen. Code, § 69, subd. (a).) "[F]orceful resistance of an officer by itself gives rise to a violation of section 69, without proof force was directed toward or used on any officer." (*People v. Bernal* (2013) 222 Cal.App.4th 512, 520 (*Bernal*).)

There was substantial evidence that defendant knowingly resisted the officers by using force. Footage from body cameras worn by Sergeant Mathis and Officer Adgar shows Sergeant Mathis opening the passenger door to the truck and commanding

15

defendant three times to open his door. Defendant turned and looked out the driver's side window, but he did not comply with Sergeant Mathis's commands. (Officer Cuellar testified that his patrol car was parked "to the rear left on the driver's side" and he was positioned behind the driver's side door facing the Freightliner when Sergeant Mathis entered the truck.) Instead, defendant placed his hands on the steering wheel and gearshift, at which time Sergeant Mathis entered the truck cab followed by Officer Adgar. Sergeant Mathis repeatedly ordered defendant, whose hands were on the truck's controls, to "turn [the engine] off." The ignition switch was to the left of the steering column, but defendant used one hand to cover a yellow knob on the center dashboard (identified in a photo as the parking brake) while using his free hand to manipulate the gearshift located to the right of the steering column. Sergeant Mathis observed defendant's foot on the accelerator pedal. The truck briefly moved in reverse, and then moved forward over a drop of approximately three feet into Target's delivery bay. The officers "got rocked around pretty good in [the] cab." Sergeant Mathis's knee jammed against the dash and his hand jammed "against something." Officer Adgar was propelled through the open door onto the pavement.

Defendant may not have intended to injure the officers, but Penal Code section 69 does not require an intent to harm or even the direct application of force or violence against an officer. (*Bernal*, *supra*, 222 Cal.App.4th at p. 520.) The evidence shows defendant actively resisted Sergeant Mathis by physically blocking access to the truck's controls, including the parking brake. Defendant defied lawful orders by putting the truck in gear, causing it to move backward, then forward, with the passenger door open and both officers precariously balanced in the passenger area. As a result of defendant's indirect use of force, both officers were deterred or prevented from performing their duties.

16

### 3. *Sufficiency of the Evidence Regarding Taking the Patrol Car*

Defendant argues the evidence was insufficient to prove he took the patrol car with intent to *permanently* deprive the owner of possession. He argues the only reasonable inference to draw from the totality of the evidence is that he intended to use the patrol car as a temporary means to escape custody. Vehicle Code section 10851 requires that a person who takes a vehicle without the owner's consent have the intent to either permanently or temporarily deprive the owner of the vehicle's possession. Significantly, defendant was charged with taking the patrol car (and the trucks) with the intent to temporarily deprive the owners of possession, but the People elected to prosecute the offenses as permanent deprivations, and the jury was instructed *only* on the intent to permanently deprive. We therefore confine our review to whether the evidence supports an intent to permanently deprive the owner of possession of the vehicle. (See *Cole v. Arkansas* (1948) 333 U.S. 196, 202 ["To conform to due process of law, [persons are] entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court."].)

We have found no cases addressing intent to permanently deprive in the context of Vehicle Code section 10851 (presumably because the statute also criminalizes the unlawful taking of a vehicle with the intent to temporarily deprive the owner of possession). We find useful the Supreme Court's discussion in *People v. Davis* (1998) 19 Cal.4th 301, which addressed intent to permanently deprive in the context of trespassory larceny (receiving store credit for an item taken from a display rack and presented to the cashier as previously purchased merchandise). The *Davis* court commented that " '[t]he word "permanently," as used here is not to be taken literally,' " noting several types of cases in which the requisite intent to steal may be found even though a person's primary purpose in taking the property is not to deprive the owner permanently of possession: "(1) when the defendant intends to 'sell' the property back to its owner, (2) when the defendant intends to claim a reward for 'finding' the property,

17

and (3) when … the defendant intends to return the property to its owner for a 'refund.' "
(*Id*. at p. 307.) *Davis* also recognized an intent to permanently deprive "when the nature of the property is such that even a temporary taking will deprive the owner of its primary economic value" (such as perishable goods), and notably where a person "takes property with intent to use it temporarily and then to *abandon* it in circumstances making it unlikely the owner will recover it." (*Id.* at p. 308, fn. 4.) As examples of the last category, the court cited two cases from the nineteenth century involving abandoning horses miles from where they were taken. (*Ibid*.) The court noted an intent to permanently deprive was also found in *State v. Langis* (1968) 251 Or. 130, where the defendant took an automobile with intent to leave it in a city 70 miles away. (*Davis*, at p. 308, fn. 4.)

The Attorney General contends substantial evidence supports the jury's implicit finding that defendant abandoned the patrol car "under circumstances that made it unlikely the owner would recover it—in an obscure location over 20 miles from the scene after evading a police pursuit." The Attorney General points to the totality of the circumstances, including the fact that defendant had recently stolen three trucks, to support defendant's conviction for taking the patrol car with intent to permanently deprive the owner of possession.

The patrol car was located soon after it was abandoned. Sergeant Mathis testified that he arrived at the location "20 to 30 minutes after the patrol vehicle took off." A photograph showed the car recovered in a parking lot associated with active businesses, and not in an obscure location or under circumstances where it would be unlikely to be found. The car did not appear to be altered or damaged, and it was not concealed from view. Defendant's actions (freeing himself from the back seat of patrol car, moving to the driver's seat, speeding off, and abandoning the car 20 miles away in a well-trafficked parking lot) demonstrate his intent to use the patrol car temporarily to escape custody. Nor can an intent to permanently take the patrol car be reasonably inferred from the

18

commercial truck thefts, which bore no resemblance to the circumstances of the patrol car taking and abandonment.

"[P]roof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery." (See *People v. Butler* (1967) 65 Cal.2d 569, 573, disapproved on other grounds in *People v. Tufunga* (1999) 21 Cal.4th 935, 938–939.) Defendant's actions with the patrol car were inconsistent with an intent to permanently deprive, and the Attorney General's authorities do not convince us otherwise. In *People v. Morales* (1993) 19 Cal.App.4th 1383, substantial evidence supported a conviction for auto burglary with the intent to permanently deprive based on the armed nighttime break-in of a locked car. The break-in was planned, access was achieved by smashing a window, and Morales used deadly force to avoid apprehension. (*Id.* at p. 1394.) In *People v. Deleon* (1982) 138 Cal.App.3d 602, substantial evidence supported a conviction for robbery based on taking the victim's car by force. (*Id.* at p. 606.) There the fact that the car was abandoned soon after it was taken did not compel the conclusion that the defendants intended to deprive the owner of possession only temporarily. The court observed that the jury "might reasonably conclude … that [the defendants] intended to deprive the owner permanently of the car, but after discovering the valuable coins inside [a briefcase in the car] concluded that they had better abandon the car as quickly as possible because the police would not treat this as a routine car theft." (*Ibid.*) We see no similar circumstance present here.

We will direct the trial court to vacate defendant's conviction and enter an acquittal on count 4. Because the basis for reversal is insufficient evidence, retrial of count 4 is barred by double jeopardy. (*People v. Eroshevich* (2014) 60 Cal.4th 583, 591.) In light of our conclusion, we need not address defendant's arguments relating to a jury question about count 4.

19

### C. MISCONDUCT CLAIMS

#### 1. *Prosecutorial Misconduct*

Defendant argues the prosecutor committed prejudicial misconduct during closing argument by misstating the law about deliberating on the lesser included offense to counts 5 and 6 (resisting an officer using force). Defendant forfeited the claim by failing to object and request a curative instruction. (*People v. Benson* (1990) 52 Cal.3d 754, 794 ["a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety"].) Nonetheless, we elect to reach the merits of the claim in the interest of judicial economy rather than address a related ineffective assistance of counsel claim. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993.)

" 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction the denial of due process, or involves deceptive or reprehensible methods to persuade the trier of fact.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) We " 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Ibid.*) Misconduct rising to the level of federal constitutional error is reviewed for prejudice under *Chapman v. California* (1967) 386 U.S. 18. (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1534.)

Under California law, a trial court may require that a jury return an express acquittal on a charged offense before returning a verdict on a lesser included offense. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1110.) But a jury has the discretion to choose the order in which it considers and deliberates on the greater and lesser offenses, and it

20

may consider a lesser included offense before acquitting on a greater offense. (*Ibid*.; *People v. Kurtzman* (1988) 46 Cal.3d 322, 324–325.) Defendant argues the prosecutor committed *Kurtzman* error by "repeatedly and unambiguously [telling] the jury that they must make a not guilty finding as to the greater offense before even considering the lesser offense."

Defendant asserts the italicized passages from the prosecutor's argument are material misstatements of law amounting to prejudicial misconduct: "[PROSECUTOR]: Count 5 and Count 6 have something attached to them, which is called a lesser-included offense. This is not a charged offense. It is something that is — basically, if you think there are elements missing of Counts 5 and 6 *and you were to find the defendant not guilty of Counts 5 or 6, then you would move down to this lesser-included offense*. [¶] And this is resisting or delaying an officer. I talked to you about this because it's going to be one of those instructions you have back there. It's going to be something you read. It is going to be one of the verdict forms you have. [¶] But I would submit to you that the evidence has been shown that the defendant is guilty of Count 5 and Count 6. *So what I'd ask you to do first is think about 5 and 6. Make a decision on whether you find him guilty, because if you find him guilty on Count 5 and Count 6, then you can ignore these. And you don't need to talk about them at all.* Because if you find him guilty on Count 5 or on Count 6, then you — [¶] [THE COURT]: "Or." 5 has to be considered separately from 6. Is that not correct? [¶] [PROSECUTOR]: Yes. [¶] [THE COURT]: So 5 is separate. You deal with 5. You deal with 6. Separately. Right? [¶] [PROSECUTOR]: Yes. Yes. [¶] I'm sorry. There will be instructions back there. I don't — I really don't want to confuse you on this issue. [¶] But if you find him guilty of Count 5 and Count 6, *then you do not need to look or think about these. In fact, you can't look or think about these.* And that's what the instruction will tell you. [¶] But if you were to decide that he was not guilty on 5 and 6, then you could move on to these. And, basically, this is, more or less, the same charge. It's just that you have to find that

21

there was no force.  [¶]  So if you think that what he did did not put force on the officers, that driving the semitruck was not forceful, then you could find him guilty of this lesser included of resisting or delaying an officer.  [¶]  If you find that he didn't use force in the truck but you think that running away from the officers was resisting or delaying, you can find him guilty of this lesser as well.  [¶]  I'm not going to belabor this point because I think when you go back there, you'll go through 5 and 6 and you'll find him guilty of those charges.  But you will have this back there as well too."

The prosecutor did not "repeatedly and unambiguously" tell the jurors "they must make a not guilty finding as to the greater offense before even considering the lesser offense," as defendant claims.  Taken as a whole and in context, we view the prosecutor's comments as urging the jury to consider the charged offenses first because, in her view, that would facilitate deliberations.  We see no attempt to confuse the jury, and we note the prosecutor referred the jurors to the written instructions they would have in the deliberation room.

The jury was instructed with CALCRIM No. 3517, which addressed deliberations and completion of verdict forms "when lesser included offenses and greater crimes are not separately charged and the jury receives guilty and not guilty verdict forms for greater and lesser offenses."  That instruction stated:  "It is up to you to decide the order in which you consider each crime and the relevant evidence, but I can accept a verdict of guilty of a lesser crime only if you have found the defendant not guilty of the corresponding greater crime."  The jury was also instructed with CALCRIM No. 200:  "If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  Even if the prosecutor's argument conflicted with the instructions, we see no prejudicial error or due process violation considering the record as a whole.  (See *People v. Bacon*, *supra*, 50 Cal.4th at p. 1110 [review determines "whether the jury was reasonably likely to have construed the instruction in a manner that violated the defendant's rights"]; *People v. Kurtzman*, *supra*, 46 Cal.3d at p. 335 ["it is not reasonably

22

probable jurors would have found defendant not guilty of second degree murder absent the court's erroneous comments" regarding order of deliberations]; *People v Riggs* (2008) 44 Cal.4th 248, 298 [misconduct that does not result in the denial of a defendant's specific constitutional rights "is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process" ' "].) The jury here necessarily deliberated on and rejected the lesser offense by finding defendant used force in resisting the officers. (See *Kurtzman*, at p. 335 [no prejudice where jury had in fact deliberated on greater and lesser offenses].)

Defendant's authority, *People v. Olivas* (2016) 248 Cal.App.4th 758, is distinguishable. *Olivas* involved counts charged in the alternative, not uncharged lesser offenses. (*Id*. at p. 767.) A different panel of this court found prejudicial error where the trial court answered "no" to the jury's question whether it could consider an alternative charge if the jurors were hung on a more severe charge. (*Id*. at p. 774.) The evidence regarding the more severe charges was not overwhelming; the jury's question indicated it was hung on one of those counts for at least some period of time; the trial court's answer "no" was unambiguous; and there was no indication the jury continued deliberating on the less severe alternatives after receiving the incorrect instruction. (*Olivas*, at pp. 775–777.)

2. *Judicial Misconduct*

Defendant argues the trial court violated his right to due process and committed structural error by reprimanding defense counsel during opening statements. He argues the court breached its duties to be courteous and impartial, and by failing to reprimand the prosecutor for the same conduct, the court conveyed a message to the jury that it was aligned with the prosecution.

Trial counsel objected to two portions of the prosecutor's opening statement as improper argument. The first related to evidence of the gas station burglary: "[The witness] will tell you that he examined that switch after the defendant, Mr. Trujillo, was

23

arrested and removed from the scene. And that switch was changed from that automatic mode to the manual mode. And that's how the defendant was pumping that gasoline without paying for it." The trial court overruled counsel's objection, but "remind[ed] both attorneys, opening statements is 'the evidence will show.' " Counsel's second objection related to defendant's changed appearance when he was arrested on October 9: "He changes his clothes. He shaves his face. He puts on a Fedora. He puts on a boot, a walking boot in order to hide his identity." That objection was sustained.

Trial counsel then addressed the jury: "The District Attorney has offered you a preview of what they think the evidence is going to show in this case. Nothing you just heard is evidence. The Judge instructed you on that and I want you to bear that in mind. [¶] You, the jury will hear the evidence in this case. You will be the sole parties who get to evaluate the evidence, to see the evidence, to hear the evidence." The court injected, "That's argument. [¶] Move on please." Counsel continued: "Your job, your sole job is to think critically about every —" The court again cautioned, "That's argument." Counsel continued: "You the jury are the fact finders in this case. The lawyers are going to argue and the Judge will instruct you with regards to the law, but you and you alone are going to decide the facts in this case." The court asked, "Are you just ignoring me?" Counsel requested a sidebar. The court responded: "No, [']the evidence will show['] or you can reserve until [] she's through with her case. But your every statement should start with 'The evidence will show.' " Counsel stated he would reserve, and the prosecutor called her first witness.

Defendant forfeited his misconduct claim because he declined to enter an objection on the record when invited to do so outside the presence of the jury. (*People v. Snow* (2003) 30 Cal.4th 43, 78 [judicial bias claim forfeited where "counsel failed to object, or seek a jury admonition regarding[] any of the instances of alleged judicial intemperance"].) The court revisited the matter after the close of evidence, "to make sure" it had not prejudiced defendant or his attorney "in any way about the opening

24

statements." The court acknowledged it had admonished counsel, "I hope politely," and cut off counsel "thinking that he — at the time his case was appropriately presented, he might have something to put on the record." Counsel did not assert prejudice or request a curative instruction at that time, electing instead to proceed to closing argument.

A judge has "the duty and the discretion to control the conduct of the trial," and " '[i]t is well within [such] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.' " (*People v. Snow*, *supra*, 30 Cal.4th at p. 78.) The relevant inquiry for us is not " 'whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid,' " but " 'whether the judge's behavior was so prejudicial that it denied [defendant] a fair, as opposed to a perfect, trial.' " (*Ibid*.)

We see no prejudice here from the isolated admonition. This is not a case where the court " 'persistently ma[de] discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression that it is allying itself with the prosecution.' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233.) The trial court was consistent, if overzealous, in requiring both parties to preface each statement with the phrase "the evidence will show." Moreover, the judge instructed the jury not to "take anything I said or did during the trial as an indication of what I think about the evidence, the witnesses, or what your verdict should be." (CALCRIM No. 3530.) The jurors are presumed to have understood and followed that instruction. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

### D. CUMULATIVE ERROR

We reject defendant's argument that the cumulative impact of trial court error deprived him of a fair trial under the federal Constitution. We find no trial court error and therefore no cumulative prejudice, and our examination of the entire record shows no miscarriage of justice (Cal. Const., art. VI, § 13) or due process violation.

25

### E. RESTITUTION ERROR

At sentencing, the trial court denied defendant's request for a restitution hearing. The prosecutor argued there was sufficient evidence adduced at trial to order the restitution recommended in the probation report, and a hearing would be cumulative. To support restitution to the gas station in the amount of $5,872, she referred to People's Exhibit 20, a spreadsheet showing the quantity and selling price of the fuel pumped by defendant. As evidence of the $51,810 loss claimed by the Freightliner dealership, she represented – incorrectly – that a witness from the dealership testified at trial to approximately $51,000 in damage to the undercarriage of the truck. The $51,810 figure was actually based on the dealership's verbal communication to the probation officer, who requested but never received documentation to support the loss. Defendant asked for receipts to support the losses. The court found the amount of restitution was "clear on the record," and ordered defendant to pay $5,872 to Pacific Pride gas station for the stolen fuel (1,600 gallons at $3.67 per gallon), and $51,810 to Golden Gate Truck Center for the damage to the Freightliner truck.

Victim restitution is governed by Penal Code section 1202.4. Subdivision (f) of that section "require[s] that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Pen. Code, § 1202.4, subd. (f).) The statute also provides "the right to a hearing before a judge to dispute the determination of the amount of restitution." (Pen. Code, § 1202.4, subd. (f)(1).) The amount of restitution must be factually supported and rational, and a defendant "must be given a meaningful opportunity to controvert the information to be considered and relied on by the court." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1125.) These authorities make clear that defendant was entitled to a restitution hearing.

Citing *People v. Gemelli* (2008) 161 Cal.App.4th 1539, the Attorney General argues that the trial court was entitled to consider the probation report as prima facie

26

evidence of the victims' losses, and defendant cannot overcome the presumption that any error in not conducting a restitution hearing was harmless. *Gemelli* discussed the type of proof that may satisfy the prosecutor's burden *at a restitution hearing,* as was held in that case. (*Id*. at pp. 1541, 1544–1546.) The case does not support denying a hearing that has been requested by a defendant.

Further, the trial court did not rely on the probation report as prima facie evidence of loss. The court relied on People's Exhibit 20 to support the loss to the gas station. Defendant did not have the opportunity to determine whether the amount of loss comported with Penal Code section 1202.4, subdivision (f)(3)(A), which uses replacement cost to calculate the loss of stolen property, or whether the recovered fuel had any value. The court also relied on the prosecutor's incorrect representation that the manager of the truck dealership had testified to the cost of repairing the Freightliner. No evidence of the dealership's loss was provided at trial or documented to the probation officer.

### III. DISPOSITION

The judgment is reversed. The matter is remanded for the trial court to enter a new judgment acquitting defendant of count 4 (taking or unauthorized use of the patrol car) and reinstating the convictions on the remaining counts. Defendant shall be resentenced in light of the acquittal. The trial court is ordered to conduct a restitution hearing and enter a new order of restitution based on the evidence adduced at that hearing.

_____

Grover, J.


**WE CONCUR:**


_____

Greenwood, P. J.


_____

Lie, J.


H047126 - *The People v. Trujillo*